```
               UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF MICHIGAN
                     SOUTHERN DIVISION
_____

UNITED STATES OF AMERICA

        v.                            File No. 1:19-cr-00041

PHILIP GORDON PAAUWE,

          Defendant.
_____/

                         Hearing
Before

               THE HONORABLE ELLEN S. CARMODY
                 United States Magistrate Judge
                    February 28, 2019

                     APPEARANCES

For the Government:     Ms. Alexis Sanford
                        Ms. Kristin Pinkston
                        Mr. Davin Reust
                        Assistant U.S. Attorney (Grand Rapids)
                        The Law Building
                        330 Ionia Avenue, N.W.
                        P.O. Box 208
                        Grand Rapids, MI   49501-0208
                        (616) 456-2404
                        alexis.sanford@usdoj.gov
                        kristin.pinkston@usdoj.gov
                        davin.reust@usdoj.gov


For the Defendant:      Matthew G. Borgula
                        Springstead, Bartish, Borgula & Lynch
                        15 Ionia Ave, S.W., Ste. 520
                        Grand Rapids, MI   49506
                        (616) 458-5500
                        matt@springsteadbartish.com


Courtroom Deputy:       J. Lenon

Recorded By:            Digitally Recorded

Transcribed By:         Bonnie L. Rozema, CER-5571
                        (616) 878-9091
                        rozemab1@comcast.net
```

TABLE OF CONTENTS

WITNESS:                                          PAGE

TFO JOEL SIEMENS

        Direct examination by Mr. Reust          15
        Cross-examination by Mr. Borgula         34
        Redirect examination by Mr. Reust        50
        Recross-examination by Mr. Borgula       51




EXHIBITS:                              IDENTIFIED  RECEIVED

Govt. Exhibit 1 - Screenshot from Whisper       13          13

Govt. Exhibit 2 - Screenshot from Kik           13          13

Govt. Exhibit 3 - Screenshot of Google Maps     13          13

Govt. Exhibit 4 - Photos of body parts with
        Blood                                   13          13

1     Grand Rapids, Michigan

2     Thursday, February 28, 2019 - 1:39 p.m.

3                    THE COURTROOM DEPUTY:  Court calls case

4     1-19-cr-41, U.S.A. versus Philip Gordon Paauwe.

5                    THE COURT:  Good afternoon.  Would counsel

6     please put your appearances on the record.

7                    MS. SANFORD:  Good afternoon, your Honor.

8     Alexis Sanford appearing on behalf of the United States.

9     Present with me at counsel table is AUSA Kristin Pinkston.

10                    THE COURT:  Good afternoon to both of you.

11                    MR. BORGULA:  Good afternoon, your Honor.  Matt

12    Borgula on behalf of Philip Paauwe, who is standing to my

13    right.

14                    THE COURT:  Oh, good afternoon to you, and good

15    afternoon to you, Mr. Paauwe.

16                    MR. PAAUWE:  Good afternoon, your Honor.

17                    THE COURT:  This is the date and time set for

18    Mr. Paauwe's initial appearance and an arraignment, and I

19    believe we're also going to conduct an initial pretrial

20    conference at this time.

21                    I'm going to talk to you about your rights in

22    some detail, Mr. Paauwe, and talk to you about what the

23    charge is against you, what the penalties for that could

24    be, and at the end of the arraignment you'll have a chance

25    to come up with your attorney for purposes of entering a

1    plea.

2                MR. PAAUWE:  Yes, your Honor.

3                THE COURT:  And the first thing I want to tell

4    you is you do have the right to remain silent.  You do not

5    have to say anything to anyone about what you've been

6    charged with.  You don't have to say anything to me, you

7    don't have to say anything to anyone from law enforcement,

8    or to anyone else.  However, anything that you do say can

9    and may be used against you at the trial of this matter.

10   Do you understand that, sir?

11               MR. PAAUWE:  Yes, I do, your Honor.

12               THE COURT:  Okay.  Now I'm just flipping through

13   my things to make sure I don't miss anything.

14               Now in terms of you also have the right to have

15   an attorney represent you at every stage of this

16   proceeding.  You are free to hire your own attorney, which

17   I believe he has done.  He's retained you, Mr. Borgula?

18               MR. BORGULA:  That's correct, your Honor.

19               THE COURT:  All right.  And that is fine.

20   However, if you could not afford an attorney and request a

21   court-appointed counsel, and you qualified financially,

22   counsel would be appointed to represent you at no charge to

23   you.  Do you understand that, sir?

24               MR. PAAUWE:  Yes, I do, your Honor.

25               THE COURT:  And let me ask you before we go any

—4—

1       further, is there anything wrong with you today, either

2       physically or mentally, that would make it difficult for

3       you to follow what is going on here?

4              MR. PAAUWE:  No, your Honor.

5              THE COURT:  Have you had any prescription

6       medication or any other substance in the last 24 hours that

7       would make you sleepy, dizzy, drowsy, confused, anything

8       like that?

9              MR. PAAUWE:  No, your Honor.

10            THE COURT:  And is there anything -- you also

11      have the right to have the charges against you reviewed by

12      a grand jury, and that, in fact, has occurred in this case.

13      A grand jury is at least 16 and not more than 23 people.

14      Their job is to listen to evidence and decide when they

15      think there is probable cause to believe a crime has been

16      committed and that you have been involved in committing it.

17      At least 12 grand jurors has to find probable cause to

18      return what's called an indictment against you, and then

19      the charges against you can proceed to trial.  And as I

20      already stated, that has already occurred in your case.

21           You have the right to plead not guilty and the

22      right to a trial by a jury of 12 persons selected at random

23      from this community.  You are presumed to be innocent and

24      the government has the burden of proving you guilty beyond

25      a reasonable doubt.  You have the right to have your jury

1    trial be both speedy and public.  At trial you have the

2    right to testify or you may remain silent.  You have the

3    right to present evidence to confront and cross-examine the

4    witnesses against you, to call witnesses to testify for

5    you, and to have the Court issue court orders called

6    subpoenas forcing witnesses to come to the trial if you

7    think they will have testimony that is helpful to you.  And

8    you have the right to have your attorney help you do all of

9    those things.

10            You may plead any one of three ways:  Not

11   guilty, guilty, or with the consent of the district judge,

12   in your case that would be the Honorable Paul Maloney, you

13   can plead something that's called no contest.  You also do

14   not have to enter a plea.  If you choose not to enter a

15   plea, that's called standing mute.  The court will enter a

16   not guilty plea on your behalf.  If you plead guilty or no

17   contest, there's no further trial of any kind.  By entering

18   this type of a plea, you give up your right to a trial by a

19   jury or judge.  You give up your right against

20   self-incrimination, and your right to confront and

21   cross-examine witnesses against you, and to call witnesses

22   to testify for you.

23            Now, do you have any questions at this time

24   about any of your rights as I've described them to you?

25            MR. PAAUWE:  I do not, your Honor.

1          THE COURT:  And how far did you get in school,

2     sir?

3          MR. PAAUWE:  I have a bachelor's degree, your

4     Honor.

5          THE COURT:  All right.  And have you had a

6     chance to read and sign the Defendant's Rights Form?

7          MR. PAAUWE:  Yes, I have, your Honor.

8          THE COURT:  All right.  Now have you had the

9     chance to read the indictment against you?

10         MR. PAAUWE:  Yes, I have, your Honor.

11         THE COURT:  Okay.  And is that -- have you had

12    the chance to discuss that with Mr. Borgula?

13         MR. PAAUWE:  Yes, I have, your Honor.

14         THE COURT:  Will he waive the reading of the

15    indictment if I summarize it for him, Mr. Borgula?

16         MR. BORGULA:  Yes, your Honor.

17         THE COURT:  Counts 1 and 4 each charge you with

18    coercion and enticement of a minor, and there is a minimum

19    penalty of ten years in prison, a maximum penalty of up to

20    life in prison, and/or up to a $250,000 fine, supervised

21    release, minimum of five years and maximum of life.

22    Restitution is mandatory, and there's also a special

23    assessment of $5,100.  And you'd also have to register as a

24    sex offender.  There's also a forfeiture claim in the

25    indictment.  That is not a separate charge.  It's simply

1    seeking the forfeiture of various items, including pictures

2    and -- that are alleged to be involved, and also some

3    iPhone.  So that's the nature of the forfeiture charge.

4             Now Count 2 charges you with sexual exploitation

5    of a minor, and there's a minimum penalty of not less than

6    15 years in prison, a maximum penalty of not more than 30

7    years in prison, and/or up to a $250,000 fine, a minimum

8    supervised release period of at least five years, and a

9    maximum supervised release period of life.  There's

10   mandatory restitution and a special assessment of $5100.

11   And you'd also have to register as a sex offender.  And

12   there's also a forfeiture, the same count in -- or the same

13   allegations in support of that charge.

14            Count 3 charges you with receipt of child

15   pornography, and there's a minimum penalty of not more than

16   five years in prison, maximum penalty of not more than 20

17   years in prison, and/or up to $250,000 fine, a minimum term

18   of supervised release of five years, a maximum term of up

19   to life.  Restitution is mandatory.  There's also a $5100

20   special assessment, and you'd have to register as a sex

21   offender, and the forfeiture allegations also attach to

22   that count.

23            Count 5 charges you with possession of child

24   pornography, and there is a maximum penalty -- maximum

25   penalty of up -- there's no minimum penalty attached to

—8—

1          that, but there's a maximum penalty of not more than 20

2          years in prison and/or up to a $250,000 fine, minimum

3          supervised release period of five years, a maximum

4          supervised release period of life, restitution is

5          mandatory.  There is a $5100 special assessment, and you

6          would also have to register as a sex offender.

7                    Now I don't want you to say anything about the

8          charges at this time, but I do want to know, do you think

9          you understand what you've been charged with?

10                   MR. PAAUWE:  Yes, I do, your Honor.

11                   THE COURT:  And do you understand what the

12         penalties for that could be?

13                   MR. PAAUWE:  Yes, I do, your Honor.

14                   THE COURT:  All right, Mr. Borgula, would you

15         and your client please come up to the podium at this time.

16         Is your client, Mr. Paauwe, prepared to enter a plea at

17         this time?

18                   MR. BORGULA:  Yes, your Honor.  He pleads not

19         guilty to all counts.

20                   THE COURT:  So a not guilty plea will be entered

21         on your behalf, Mr. Paauwe, to Counts 1, 4, 2, 3, and 5.

22         You may be seated.  Thank you, sir.

23                   The next thing we are going to do is to have

24         what's called an initial pretrial conference.  This is a

25         very brief proceeding.  It's really your attorney's chance

1      to learn a little bit more about the government's case

2      against you, and if Mr. Borgula has not discussed with you

3      the government's disclosures, I'm sure he will be doing so

4      in the near future.

5              Ms. Sanford, are you -- is your pretrial

6      conference summary statement in good order?

7              MS. SANFORD:  Yes, your Honor.

8              THE COURT:  All right.  Any problems, questions,

9      or concerns with it, Mr. Borgula?

10             MR. BORGULA:  No, your Honor.

11             THE COURT:  And is yours also in good order?

12             MR. BORGULA:  We haven't filed one yet, but we

13     will do so in short order, your Honor.

14             THE COURT:  Okay, a five day order will go out,

15     all right?

16             MR. BORGULA:  Thank you, your Honor.

17             THE COURT:  Okay.  And so you don't know if you

18     have any problems, questions, or concerns with it at this

19     time?

20             MS. SANFORD:  Correct.

21             THE COURT:  And I believe that the government is

22     moving for Mr. Paauwe's detention; is that correct?

23             MS. SANFORD:  That is correct, your Honor.

24             THE COURT:  And I think we're going to have our

25     detention hearing, as I recall, at 3:30 p.m.; is that

—10—

1          correct?

2                    MS. SANFORD:  Yes, your Honor.  I -- this is

3          Mr. Reust's case, but I believe he wanted to call a witness

4          who is not available until later in the afternoon, and so

5          that's why there's this bifurcated hearing.

6                    THE COURT:  Okay, that's fine.  And are you

7          prepared to come to that hearing, Mr. Borgula?

8                    MR. BORGULA:  Yes, your Honor.  That's fine.

9                    THE COURT:  All right.  Now before I adjourn

10         your matter, Mr. Paauwe, do you have any questions you

11         would like to ask me at this time?

12                   MR. PAAUWE:  No, I do not, your Honor.

13                   THE COURT:  And how about you, Mr. Borgula?

14         Anything further from your point of view?

15                   MR. BORGULA:  No, your Honor.  Thank you.

16                   THE COURT:  Ms. Pinkston -- or no, Ms. Sanford,

17         anything further from your point of view?

18                   MS. SANFORD:  No, thank you, your Honor.

19                   THE COURT:  All right, this matter is adjourned.

20         I'll see you all back here at 3:30.

21                   (At 1:50 p.m., off the record.)

22                   (At 4:00 p.m., back on the record.)

23                   THE COURT:  Good afternoon, would counsel please

24         put your appearances on the record.

25                   MR. REUST:  Good afternoon, your Honor.  Davin

—11—

1     Reust for the United States, and seated to my left is

2     Detective Joel Siemens.

3                 DETECTIVE JOEL SIEMENS:  Good afternoon, your

4     Honor.

5                 THE COURT:  Good afternoon to you.

6                 MR. BORGULA:  Good afternoon, your Honor.  Matt

7     Borgula on behalf of Philip Paauwe, who is seated to my

8     right.

9                 THE COURT:  Good afternoon to you, and good

10    afternoon to you, Mr. Paauwe.  This is the time set for

11    Mr. Paauwe's detention hearing.  I -- he had his initial

12    appearance and arraignment this morning.  And are you

13    prepared to proceed at this time, Mr. Borgula?

14                MR. BORGULA:  Yes, your Honor.

15                THE COURT:  And how about you, Mr. Reust?

16                MR. REUST:  I am, your Honor, and I apologize

17    for not being here for this morning's hearing.  I was tied

18    up, but thank you for continuing this.

19                THE COURT:  All right, no problem.  Let me talk

20    to you a little bit, Mr. Paauwe, about the burden is on the

21    government to prove by either clear and convincing evidence

22    that you're a danger to the community or by a preponderance

23    of the evidence that you're a flight risk.

24                Is the government moving on both counts?  I mean

25    both standards?

—12—

1          MR. REUST:  Only on danger to the community,

2     your Honor.

3          THE COURT:  All right, thank you.  And because

4     it's the government's burden, I always have the government

5     go first.  So Mr. Reust, you may proceed when you're ready.

6          (At 4:01 p.m., Government's Exhibits 1 - 4

7     introduced.)

8          MR. REUST:  Thank you, your Honor.  At this

9     time -- well, a preliminary matter, your Honor.  I have

10    tendered to your Honor, I believe they're sitting up there,

11    the government's four exhibits.  My understanding is that

12    Mr. Borgula has no objection to those exhibits, so I'd move

13    to admit them at this time.

14         THE COURT:  Is that correct, Mr. Borgula?

15         MR. BORGULA:  That's correct, your Honor.  For

16    the purposes of a detention hearing we have no objection.

17    We reserve the right to object if there were a trial some

18    day.

19         THE COURT:  All right, thank you.

20         Mr. Reust, you may proceed when you're ready.

21         MR. REUST:  Thank you.

22         THE COURT:  So those are admitted, yes.

23         (At 4:02 p.m., Government Exhibits 1- 4 admitted

24    into evidence.)

25         THE COURT:  And it's all Exhibit 1, correct?

1          MR. REUST:  No.  There are four, your Honor.

2          THE COURT:  Oh, I'm sorry.

3          MR. REUST:  One is I believe five pages, two is

4     one page, three is one page, and four is three pages.

5          MR. BORGULA:  I don't have two pages.

6          MR. REUST:  On one?

7          MR. BORGULA:  Oh, that's -- that's -- this.

8          MR. REUST:  One is this.

9          MR. BORGULA:  Got it.

10          MR. REUST:  So at this time, your Honor, the

11     government would call Detective Joel Siemens.

12          THE COURT:  All right.  Mr. Siemens, you may

13     come up to the witness box, but first be sworn in.

14          THE COURTROOM DEPUTY:  Do you swear or affirm

15     that the testimony you are about to give will be the truth,

16     the whole truth, and nothing but the truth so help you God?

17          DETECTIVE SIEMENS:  I do.

18               DETECTIVE JOEL SIEMENS,

19          sworn by the courtroom deputy at 4:03 p.m., took

20     the stand and testified upon his oath as follows.

21          THE COURTROOM DEPUTY:  Please take the stand,

22     state and spell your name for the record.

23          THE WITNESS:  My name is Joel Siemens, J-o-e-l,

24     Siemens, S-i-e-m-e-n-s.

25          THE COURT:  Good afternoon.

```
 1                      THE WITNESS:  Good afternoon.

 2                      DIRECT EXAMINATION

 3    BY MR. REUST:

 4    Q    Good afternoon, Detective Siemens.  Where do you work and

 5         what do you do there?

 6    A    I work for the Kent County Sheriff's Department where I am

 7         a detective and assigned to the FBI on a task force, it's

 8         called the Web Text Task Force and I'm a task force officer

 9         for the -- for them.  That's a mouthful.  It's a task force

10         that focuses on the combatting, investigating, and

11         preventing violent crimes against children.

12    Q    That was my next question.  So have you been involved in

13         such an investigation into who you ultimately identified as

14         Mr. Paauwe?

15    A    I was.

16    Q    And how did your investigation begin that ultimately led

17         you to Mr. Paauwe?

18    A    One of my duties as a task force officer is to conduct

19         on-line undercover investigations, and through one of those

20         on-line undercover investigations I came in contact with

21         Mr. Paauwe.

22    Q    What -- what was your role in that on-line undercover

23         investigation?

24    A    I presented a persona on a social media application and was

25         approached by Mr. Paauwe, and the two of us began to
```

|   |   |   |
|---|---|---|
| 1 |   | converse.  My persona was a 33 year old mother who had a 13 |
| 2 |   | year old child, female child. |
| 3 | Q | And what was the platform that you initially conversed with |
| 4 |   | Mr. Paauwe on? |
| 5 | A | Whisper. |
| 6 | Q | Is that some kind of on-line -- |
| 7 | A | Whisper is -- |
| 8 | Q | -- website? |
| 9 | A | Correct.  It's an on-line social media application.  You |
| 10 |   | can post a picture or a phrase, and then people can respond |
| 11 |   | to it or reach out and initiate chats or conversations with |
| 12 |   | you. |
| 13 | Q | In front of you on the ledge there is an exhibit marked |
| 14 |   | Government's Exhibit 1.  Could you just describe what that |
| 15 |   | is? |
| 16 | A | This is a screenshot from the Whisper application that I |
| 17 |   | had mentioned.  It includes the original post, as well as |
| 18 |   | some follow-up conversation that took place between |
| 19 |   | Mr. Paauwe and myself. |
| 20 | Q | And so there are two colors that are, it's kind of text in |
| 21 |   | a white box and text in a purple box.  Which of those is -- |
| 22 |   | are your statements and as the undercover persona? |
| 23 | A | The dark purple box. |
| 24 | Q | And so that means the white is who? |
| 25 | A | Mr. Paauwe. |

1    Q    And just generally describe what kind of communications you

2         were having with Mr. Paauwe as you pose as a 33 year old

3         mother of a 13 year old.

4    A    We had discussions that had a husband that had passed away.

5         Later it's, and this was on October 31st, we discussed that

6         I took -- my persona took her daughter trick or treating

7         and then conversation became sexual in nature.

8    Q    Are you on the third page of Government's Exhibit 1 at this

9         point?

10   A    Yes, I am.

11   Q    And I spoke to Mr. Borgula beforehand and I agreed not to

12        read this in the record or have you read this in the

13        record, but are the most, I guess, graphic sexual requests

14        at the bottom of this third page?

15   A    Yes, it is.

16                  MR. REUST:  Okay.  So the Court should read

17        those to see kind of what the most graphic depicted

18        statements are that Mr. Paauwe made.

19                  THE COURT:  Okay.  Just give me a minute then.

20        Thank you.

21                  MR. REUST:  Sorry, your Honor.

22                  THE COURT:  That's okay.  (Pause.)  Okay.

23                  (At 4:07 p.m., off the record discussion between

24        clerk and the Court.)

25                  (At 4:07 p.m., off the record.)

```
 1                         (At 4:07 p.m., back on the record.)
 2                    THE COURT:  Okay, I've read it.
 3                    MR. REUST:  Thank you, your Honor.
 4     BY MR. REUST:
 5     Q    So Government's Exhibit 1 is all communication that you had
 6          with Mr. Paauwe on the Whisper application?
 7     A    That's correct.
 8     Q    Could you -- did the conversations migrate to another
 9          on-line social media platform?
10     A    They did.
11     Q    What was that?
12     A    We then moved to Kik, which is another social media or
13          messaging digital application.
14     Q    I believe you also have on the ledge before you
15          Government's Exhibit Number 2?
16     A    I do.
17     Q    And on Kik, what color were your persona's communications?
18     A    Green.
19     Q    And then what color were Mr. Paauwe's communications?
20     A    It was in a white box with black text.
21     Q    And so the next to the last message that he sent on
22          Government's Exhibit 2 is, and I'm quoting at this point,
23          "I'm not here for fantasies either.  I will prove I am real
24          if you are, too."  Is that correct?
25     A    Correct.  "If you will too," yup.
```

1    Q    And so that's a statement he made to your undercover

2         persona who was posing as the 33 year old mother of a 13

3         year old?

4    A    That's correct.

5    Q    Thank you.  What did you do in your investigation after you

6         had these communications with Mr. Paauwe on Whisper and

7         then on Kik?

8    A    Mr. Paauwe's true identity was yet unidentified, so I had

9         sent a subpoena to Kik, who is the parent company of this

10        application, in order to obtain some additional information

11        about the subscriber or what turned out to be Mr. Paauwe.

12        As a result of me looking into his account, they had

13        determined -- Kik has determined that there was a violation

14        of terms of services and suspended the account.

15   Q    Kik decided he violated the terms of services and suspended

16        his account?

17   A    That's correct.

18   Q    So at this point -- at some point you determined who the

19        identity was of the person you were communicating with?

20   A    Yes.

21   Q    And what did you do after you figured out who it was?

22   A    Kik had supplied me with an IP address that had been used

23        as the gateway to access Kik.  I -- the IP address was

24        controlled by Comcast Corporation.  I submitted a subpoena

25        to Comcast Corporation to obtain information on the

```
 1              subscriber to that particular IP address and Comcast

 2              Corporation supplied the name Philip Paauwe on Wilfred

 3              Avenue in Grandville as the subscriber or the person who

 4              has purchased the use of that IP address.

 5      Q     What did you do after you obtained that information?

 6      A     At that point I started to look into Mr. Paauwe and sort of

 7              build my information or data set on who I am investigating.

 8      Q     What did you learn about Mr. Paauwe?

 9      A     That Mr. Paauwe was a real person.  He had a driver's

10              license.  He's a Michigan citizen.  I found out more about

11              his employment, which I discovered he was a teacher for the

12              Grand Rapids Public School District.

13      Q     And did you determine which specific school and what kind

14              of students he was teaching?

15      A     I did.  The Grand Rapids Public School District has a

16              particular school, it's a middle school that is dedicated

17              to special needs students or special education students,

18              and Mr. Paauwe was identified as the sixth grade teacher

19              for that -- the special education class.

20      Q     Thank you.  So after you identified who he was and where he

21              worked, what did you do next?

22      A     My partner, Detective Sergeant Jackie Stasiak and I made

23              contact with Mr. Paauwe at his house on January 4th of this

24              year.

25      Q     And did he agree to speak with you and Detective Stasiak?
```

1    A    He did.  We knocked on the door and identified ourselves.

2         We were invited in and we had a conversation at his kitchen

3         table.

4    Q    Did he make any statements of interest to the Court for

5         purposes of detention?

6    A    He did say that he was a schoolteacher.  He did indicate

7         sexual interest in, he had defined as teenager, and there

8         was more specific in saying 14 to 16 year olds.  And it was

9         also disclosed by Mr. Paauwe that he had downloaded child

10        pornography in the past, as well as generic pornography as

11        well.

12   Q    Did he provide any electronic devices that day?

13   A    He did.  Mr. Paauwe consented to the search of his cell

14        phone.  It was an Apple iPhone 7.  He expressed his consent

15        verbally.  We talked with him, and then he was also

16        supplied with a form where he could write out his consent

17        as well.

18   Q    Did he give you a code to get in the phone?

19   A    Yes, he did.

20   Q    Okay.  Anything else that he said of interest on January

21        4th?

22   A    Not that I can recall.

23   Q    What did you do after the interview with Mr. Paauwe?

24   A    The phone was brought to a forensic examiner.  It's a

25        detective that works at a computer crimes lab, and the

—21—

1          phone was turned over to this detective.  He, this was on a

2          Friday, downloaded or extracted the search over the weekend

3          and generated a report by Monday of that next week, which

4          was the 7th, I believe.  We started to examine some of the

5          results in that report.

6   Q   Did you find anything of interest regarding child

7          pornography?

8   A   We did.  We did find images, both the forensic detective,

9          as well as myself, found images of child pornography on the

10         phone.

11  Q   What did you do after that?

12  A   At that point we reinterviewed Mr. Paauwe on January 8th,

13         as well as executed a search warrant of his residence.

14  Q   What statements, if any, did he make on January 8th that

15         would be of interest to the Court for purposes of

16         detention?

17  A   Mr. Paauwe again expressed that he had a sexual interest in

18         young teenagers.  He had expressed that or indicated that

19         he would have images on that phone that were not going to

20         be legal, that it included a -- he provided a description

21         of a particular image that he remembered that he thought

22         might be on that phone that was one of the images that we

23         had identified as child pornography.  He also had indicated

24         a long-term on-line relationship with a minor out of

25         Florida.

```
 1    Q    Are the minor's initials G.L.?

 2    A    Yes, they are.

 3    Q    Did he have images and/or communications pertaining to G.L.

 4         saved in some specific way on the phone?

 5    A    Yes, he did.

 6    Q    What -- what was that, without saying her name?  Let me say

 7         it this way.  Did he have a folder with G.L.'s first name

 8         inside of the hidden calculator app on his phone?

 9    A    Yes, he did.

10    Q    And did you eventually review that folder?

11    A    I did.

12    Q    Were there -- what kind of photographs or what kind of

13         information was in that folder?

14    A    There were many, many photographs and videos on the folder.

15         Most of them were sexual to some extent.  They included

16         victim G.L. in various states of undress and including

17         images of G.L. engaging in sexual activity with objects and

18         with herself.  Also depicted a number of different images

19         of her pubic area that were called by -- as child

20         pornography.

21    Q    If, based on your review of that folder -- well, I'm going

22         to -- did he also ultimately provide the access information

23         for his Dropbox account?

24    A    Yes, he did.

25    Q    Did that Dropbox account also contain images of G.L.?
```

1   A   It contained many images of G.L.

2   Q   Between the Dropbox account and the folder with G.L.'s name

3       on Mr. Paauwe's calculator app, approximately how many

4       images of G.L.'s exposed pubic area would you estimate

5       there were?

6   A   Say approximately a hundred.  At least a hundred.

7   Q   Did Mr. Paauwe, when you interviewed him on January 8, did

8       he say anything about the kind of -- the kind of students

9       he was supervising?

10   A   He did.  He did explain his position, he was a teacher, and

11       that he did teach special education kids.

12   Q   Did he describe what he meant by special education?  What

13       was the disability or reason they were labeled special

14       education?

15   A   He explained to us the difference between cognitive

16       impairment and emotional impairment, or at least identified

17       that there was a difference and that his classroom was for

18       emotionally impaired students.

19   Q   What's an example of a kind of emotional impairment that

20       his students have?

21   A   From my understanding of the conversation it was a student

22       that had emotional difficulties either with their

23       interaction or with learning enough so that it may probably

24       disrupt a class, a normal classroom.

25   Q   Did he indicate he had any --

 1                    THE COURT:  Excuse my, just a minute.  I need to

 2          just disclose something here.  I was a teacher of special

 3          education emotionally impaired kids for five and a half

 4          years before I went to law school.  I don't think that will

 5          have any bearing on my decisions here, but I just wanted to

 6          let you know that, in the interest of full -- full

 7          disclosure.

 8                    MR. REUST:  Thank you, your Honor.  Obviously,

 9          the government has no objection, if Mr. Borgula has no --

10                    MR. BORGULA:  I don't believe there's any

11          evidence whatsoever that he ever touched a child, so I

12          don't know how it's relevant.

13                    THE COURT:  All right.

14                    MR. BORGULA:  But if you want to talk about his

15          job, that's fine.

16                    THE COURT:  Okay, I just -- I just wanted to --

17                    MR. BORGULA:  Yeah, no --

18                    THE COURT:  -- disclose that.

19                    MR. BORGULA:  -- I appreciate it, your Honor.

20      BY MR. REUST:

21      Q    Did he indicate that some of the emotional impairments were

22           related to sexual abuse --

23      A    Yes.

24      Q    -- of these children?

25      A    Yes, he did.

1    Q    Thank you.  Did Mr. Paauwe say anything regarding his

2         seeking any kind of psychological or emotional treatment

3         personally?

4    A    He did have a conversation about some interactions that he

5         had had with his therapist and some other frustrations that

6         he had had when he was in these sessions with the

7         therapist.

8    Q    Did he indicate when he had -- approximately when he had

9         seen a therapist?

10   A    I don't recall him putting a specific date, but the context

11        and the conversation made me feel it was within the last

12        five years.

13   Q    And did he indicate what he had seen the therapist for?

14   A    I don't recall.

15   Q    Was it related to a pornography addiction?

16   A    I know that the topic of the therapist came up when we were

17        discussing, he had brought up an addiction to masturbation

18        and pornography.

19   Q    Okay.  But he didn't say exactly why he had gone to the

20        therapist?

21   A    Not that I remember.

22   Q    Okay, thank you.  Did -- I'm going to fast forward now.

23        Has G.L. been interviewed at this point?

24   A    Yes, she has.

25   Q    And was -- is she in Florida?

1    A    Yes, she is.

2    Q    And what statements did she make that would indicate

3         Mr. Paauwe is a danger to the community?

4    A    G.L. stated that she had first come in contact with

5         Mr. Paauwe when she was 15 years old, and the conversation

6         was quickly directed in a sexual direction.  She had made

7         mention that a lot of what she -- a lot of things were

8         normalized that she -- she previously didn't think were

9         normal, including sexual contact -- including certain

10        requests from Mr. Paauwe, for example, sexual contact with

11        animals or having animals, and her dog specifically, have

12        sexual contact with her and have it recorded and sent.

13   Q    Did she state that Mr. Paauwe had directed her to do this?

14   A    Yes, she did.

15   Q    And have you seen a video of that -- that sexual contact

16        between G.L. and an animal?

17   A    Yes, I have.

18   Q    Did she state that Mr. Paauwe, I don't know what the word

19        is, but responded by also engaging in similar sexual

20        contact with an animal and sending that photograph or video

21        to G.L.?

22   A    Yes, she did.

23   Q    What other kind of conduct did G.L. describe?

24   A    G.L. described that Mr. Paauwe had a particular attraction

25        to cutting and had requested her to video tape her cutting.

-27-

1          She stated that that was something that she'd struggled

2          with in the past.  Mr. Paauwe knew about it and he used

3          that information to obtain videos and images of her

4          bleeding and cutting.

5      Q   I'm going to direct your attention now to Government's

6          Exhibit Number 4.  I'm going to hop out of order a little

7          bit.  But if you could look at that, can you just describe

8          for the record what Government's Exhibit 4 depicts?

9      A   Exhibit number 4, the first page of it depicts two body

10         parts that have blood on it.  On these particular images,

11         one of it's a hand and fingers.  The other --

12     Q   Who do you believe these images to be of?

13     A   Of G.L.

14     Q   Why is that?

15     A   Because they were located in the folder with -- that had

16         her name on it.  The image appears to be a screenshot of

17         Snapchat, which is the medium in which they communicated.

18         Snapchat's another social messaging application, and it's

19         pretty distinctive with this black ribbon with text

20         overlay, as well as a couple other indicators on here.

21         That was one of the main ways that they'd communicated, so

22         she also occasionally wore bracelets.  I can't specifically

23         say that the bracelet indicated on here around her ankle

24         was hers, but that was common to see her in items such as

25         that.

```
 1    Q    And then did she indicate that Mr. Paauwe would send her

 2         images of himself cutting himself?

 3    A    Yes.

 4    Q    And is that what the second and third pages of Government's

 5         Exhibit 4 depict?

 6    A    Of additional images, yes, on page two and page three.  On

 7         page two there's two images of him holding the knife

 8         against his tongue, also holding the knife against what

 9         looks like to his leg with a cut on it.  These images were

10         taken from Mr. Paauwe's phone.  I'm unable to say whether

11         they were sent or not, but victim G.L. stated that they did

12         exchange images with -- that contained cutting.  And then

13         on page three, this is a screenshot off of a video from

14         Mr. Paauwe where he's bleeding from the face.  It's, to

15         play the video out, it's a slow motion video of blood

16         running out of his nose and dripping onto the ground.

17    Q    Did G.L. describe any interest Mr. Paauwe may have had in

18         his students at school?

19    A    She did.  She disclosed that Mr. Paauwe had explained that

20         he was attracted to a female student of his and had

21         specifically mentioned -- do you want me to go into --

22    Q    Yes.  We have to describe it for the record.

23    A    Okay.  He had mentioned to her that he was thinking about

24         masturbating on her desk and was concerned that G.L. might

25         be jealous about this or the --
```

1    Q    Let me break this down.  I think it may be easier.

2         Mr. Paauwe indicated to G.L. that he had a sexual interest

3         in one of his students and wished to masturbate and

4         ejaculate on to that student's desk?

5    A    That's correct.

6    Q    Have you recovered a video in Mr. Paauwe's iPhone

7         extraction that depicts that?

8    A    Yes.

9    Q    Where was that saved?  Do you recall, I guess, was it in

10        the G.L. folder?

11   A    I believe so.

12   Q    Did he indicate any other sexual or did G.L. describe any

13        other sexual contact that Mr. Paauwe had had with young

14        children?

15   A    She did not specify any sexual contact that took place,

16        however, she brought up another video that she had

17        received.  This was probably from a prior job that he had

18        had in an elementary school.  G.L. recalled a time where

19        she received a video from Mr. Paauwe that depicted a first

20        or second grader putting her hands down her pants and then

21        placing her hand in her mouth, and that was a video -- that

22        was video taped by Mr. Paauwe and then sent to victim G.L.

23   Q    Did Mr. Paauwe make any statements about other children

24        that were not at school to G.L. that G.L. reported?

25        Specifically babysitting is what I'm talking about now?

1   A   G.L. did recall a conversation that took place with

2       Mr. Paauwe where Mr. Paauwe was babysitting, however this

3       is a wife's friend's daughter.  It was a two year old child

4       and it was G.L.'s impression that he was going to be there

5       alone, but instead he was accompanied by his wife, and

6       therefore, couldn't make any type of sexual contact because

7       his wife was currently there babysitting with him.

8   Q   Did he indicate to G.L. that he wished he could?

9   A   Yes, he did.

10  Q   Thank you.  And finally, did G.L. describe any incidents in

11      which Mr. Paauwe either planned to or had discussed

12      visiting her?

13  A   Yes.  She brought up two different occasions where they

14      discussed, Mr. Paauwe discussed coming down to Florida, to

15      her town in Florida and visiting her.  One was last summer,

16      summer of 2018, and again in another visit was being

17      discussed for spring break of 2019.

18  Q   What was -- well, first of all, the visit that was planned

19      in 2018, did that occur?

20  A   That did not, to the best of my knowledge.

21  Q   Did G.L. indicate why, give some reason as to why it didn't

22      happen?

23  A   It -- I think it surrounded a time where Mr. Paauwe had

24      gone through the passing of a friend, passing away of a

25      friend.  He wanted to go down there.  It didn't sound like

1           that ended up working out, but I'm not sure what the

2           reasoning was behind it not happening.

3    Q      And so then what were the plans that he would visit her

4           after your interview, at some point after the interview

5           that you had with Mr. Paauwe?

6    A      Say that again.

7    Q      So she -- she mentioned he had planned to come sometime in

8           2018, and that didn't occur?

9    A      Got it.

10   Q      There was a future event.  What was -- what were the plans

11          around that?

12   A      There was a -- let me go back just one moment to the 2018.

13          During that conversation G.L. had -- they had discussed to

14          the point of prices for airline tickets, so it sounded like

15          that was going to be, if that was going to happen, that, I

16          mean both flights.  The one during spring break, that also

17          was discussed.  G.L. had stated that the plan for both of

18          the trips would be that sexual contact would take place,

19          would probably take place in a hotel, and she would tell

20          her family and her parents that she was going to a friend's

21          house.

22   Q      Was there sexual contact that Mr. Paauwe had discussed with

23          G.L. aside from just the two of them?

24   A      Yes.  Mr. Paauwe had -- G.L. had described communications

25          with Mr. Paauwe that included Mr. Paauwe wanting to

1          introduce a child into their relationship, a young child,

2          and have victim G.L. engage in sexual contact with this

3          child in his presence.

4      Q   Did you locate -- well, let's just turn to Government's

5          Exhibit 3.  I think it's the last one you have there.  Can

6          you describe what Government's Exhibit 3 depicts?

7      A   Exhibit 3 depicts a screenshot of what's probably Google

8          Maps.  It is a map that indicates the directions between

9          your location, which appears to be Grand Rapids, Michigan,

10         and the destination, which is redacted in here, but it's

11         the same hometown and the same street as victim, G.L.,

12         lives on.

13     Q   Where was this image recovered from that's depicted in

14         Government's Exhibit 3?

15     A   This was under the folder named after G.L.'s first name on

16         Mr. Paauwe's iPhone.

17     Q   And the planned visit in the future with G.L. was for

18         actually spring break of 2019, correct?

19     A   That's correct.

20              MR. REUST:  Thank you very much, Detective

21         Siemens.  Those are all the questions I have for you at

22         this time.

23              THE COURT:  All right, thank you, Mr. Reust.

24         You may proceed with cross when you're ready, Mr. Borgula.

25              MR. BORGULA:  Thank you, your Honor.

—33—

1                          CROSS-EXAMINATION

2    BY MR. BORGULA:

3    Q    Good afternoon, Detective Siemens.

4    A    Good afternoon.

5    Q    Okay.  Let's talk first about the communications between

6         yourself acting as a 32 year old woman who had the 13 year

7         old daughter and a Mr. Paauwe.  You've indicated that you

8         know that it's Mr. Paauwe because he later told you that it

9         was him that was communicating with you, right?

10   A    That's correct.

11   Q    All right, and you -- you showed the Court a particularly

12        offensive text that she read for a moment, and you

13        indicated, or maybe the prosecutor indicated that's the

14        most graphic one, and that's found in Exhibit 1?

15   A    That's correct.

16   Q    Okay.  So in your opinion, that's the most graphic one when

17        it comes to the undercover work you were doing?

18   A    Correct.

19   Q    Okay.  And you also indicated that Mr. Paauwe says in a

20        text that he's not here for fantasies.  He'll prove that he

21        is real if you will, too.  You as the 33 year old woman,

22        correct?

23   A    Yes.

24   Q    Okay.  How did you find the IP address that was associated

25        with the communications from Mr. Paauwe?

1   A   The Whisper was subpoenaed for information regarding the

2       subscriber, and they were able to obtain the IP address.

3   Q   Okay --

4   A   Let me -- actually, let me back up.  It was Kik that was

5       subpoenaed for the IP address of the person involved from

6       the chats.

7   Q   You sent a subpoena to Kik?

8   A   Yes.

9   Q   Was that an administrative subpoena or a grand jury

10      subpoena?

11  A   Administrative subpoena.

12  Q   Did you get a search warrant at all at any point?

13  A   Not for that IP address.

14  Q   Okay.  And after you sent the subpoena did Kik shut down?

15  A   Yes, it was.

16  Q   The account?  Did they shut it down in response to your

17      subpoena?

18  A   Yes, they did.

19  Q   And did you tell them that they shouldn't do that?

20  A   I -- they didn't allow for the option.

21  Q   Okay.  Did you later send a subpoena to Whisper?

22  A   I did not.

23  Q   Okay.  Okay, and you showed the Court some pictures of what

24      appears to be a, it's an exhibit.  I don't have the exhibit

25      numbers on mine.

—35—

1          THE COURT:  It's Exhibit 4.

2    BY MR. BORGULA:

3    Q    Four.  It's a bloody ankle and what appears to be blood on

4         hands.  Did you discuss these pictures, oh, I'm sorry,

5         discuss these pictures with G.L?

6    A    No, I did not.

7    Q    Okay, so you have no idea how that cut got on there?

8    A    That's correct.

9    Q    All right.  That could be, for example, from shaving?

10   A    That could be.

11   Q    And the commentary that's on the pictures, you have no idea

12        who put that commentary on there?

13   A    That's correct.

14   Q    All right.  And did you get these off Mr. Paauwe's phone

15        or --

16   A    Yes.

17   Q    Okay.  And the blood that's on the hand with the

18        commentary, and excuse my language in advance your Honor,

19        "Not to be fucking gross, but I think I'm dying."  You

20        never asked G.L. about how the blood got to be on her hand?

21   A    That's correct.

22   Q    All right.  It could be just from grabbing her ankle after

23        she cut herself shaving?

24   A    I couldn't tell you one way or the other.

25   Q    Okay.  And then there's a picture of Mr. Paauwe, he's got

—36—

| | | |
|---|---|---|
| 1 | | some blood coming down his face and you said there was a |
| 2 | | video? |
| 3 | A | Yes. |
| 4 | Q | And that video shows blood coming out of his nose? |
| 5 | A | Correct. |
| 6 | Q | So it's fair to assume he had a bloody nose? |
| 7 | A | Yes. |
| 8 | Q | And he sent a picture to G.L. -- |
| 9 | A | I can't confirm. |
| 10 | Q | -- or a video? |
| 11 | A | -- what he did with this video. |
| 12 | Q | Oh, so you really didn't know whether that was sent to |
| 13 | | G.L.? |
| 14 | A | I don't know if this particular video was sent to G.L. |
| 15 | Q | Okay.  And there's some other pictures, one that has a |
| 16 | | blade in what appears to be Mr. Paauwe's mouth? |
| 17 | A | Yes. |
| 18 | Q | And one that shows a slight cut or scratch on a leg with a |
| 19 | | knife? |
| 20 | A | Correct. |
| 21 | Q | And that -- do you know whether or not that's Mr. Paauwe? |
| 22 | A | Either picture? |
| 23 | Q | Yes. |
| 24 | A | It appears to be Mr. Paauwe in the -- |
| 25 | Q | That's just based on your, you can see him and you can see |

1          the picture?

2     A    Right.

3     Q    Okay, but you have no more information than the Court on

4          whether or not that's Mr. Paauwe?

5     A    That's true.

6     Q    And you have no idea when that picture was taken?

7     A    Correct.

8     Q    Do you even know when it was sent?

9     A    That's correct.

10    Q    Do you even know if it was sent?

11    A    No.

12    Q    So this -- does this have any relevance at all to the

13         detention?

14              MR. REUST:  Objection, your Honor.  That's a

15         legal question.

16              THE COURT:  That is a legal question.

17   BY MR. BORGULA:

18    Q    Does it have any relevance --

19              THE COURT:  Either reframe it or --

20   BY MR. BORGULA:

21    Q    -- at all -- does it have any relevance at all to your

22         investigation?

23    A    It, because they were exchanging images that involved

24         cutting and blood and this is an image of him cutting and

25         involves blood, it appeared to me that it has relevance to

1       my investigation.

2   Q   Okay.  Now with regard to the mom that doesn't exist, and

3       that's how I'm going to refer to her because there's -- she

4       has no name, or she might have had a name but I don't know

5       what it is.  What was the fake mom's name?

6   A   I don't even know if she had --

7   Q   If you don't want to give it to us because you use it,

8       that's fine.  We'll just -- can we just call it a mom that

9       doesn't exist?

10  A   Sure.

11  Q   And the 13 year old that doesn't exist, Mr. Paauwe never

12      tried to set up a meeting place to meet with the mom?

13  A   We didn't have a specific place planned out.

14  Q   Never asked to meet you?

15  A   There was an ask -- yes, there was an intention.  Let me

16      see if it's on this.  I believe there was an indication or

17      a request on his part to meet with the persona, the mother

18      persona.

19  Q   Is that found in the exhibit?

20  A   Not in the exhibit.  I think it's in the full text of the

21      conversation.

22  Q   Okay, but nothing before the Court suggests that there was

23      a meeting place set?

24  A   There was not a specific meeting place set, but there was a

25      request by Mr. Paauwe to meet.

```
 1    Q    Okay, and how did you respond to that request?

 2    A    I think that was at the tail end of this conversation when

 3         his account was suspended.

 4    Q    With -- obviously you never met with him?

 5    A    Correct.

 6    Q    Or the mom that doesn't exist didn't meet with him.  Did

 7         Mr. Paauwe ever speak to the 13 year old?

 8    A    No.

 9    Q    Through -- okay.  He asked for a picture of the mom, right?

10    A    I believe so, yes.

11    Q    And that's on the exhibit.  Did he ever ask for a picture

12         of the 13 year old?

13    A    No.

14    Q    Okay.  So most of the communication -- all the

15         communication was with the mom that didn't exist?

16    A    That's correct.

17    Q    And all the requests for pictures were directed towards the

18         33 year old that didn't exist?

19    A    The persona, yeah.

20    Q    All right, now the young woman down in Florida, how old is

21         she, G.L.?

22    A    She's currently 17.

23    Q    Okay.  And she's a real person?

24    A    Yes.

25    Q    Okay.  And Mr. Paauwe never met with her?
```

```
 1    A    That's correct.

 2    Q    And he had communicated --

 3    A    As far as I know.  And she has not indicated to -- that

 4         they ever met.

 5    Q    You have no evidence that he met with her?

 6    A    Correct.

 7    Q    Okay, and you've spoken with G.L.?

 8    A    I have not had direct contact with her.  An agent for the

 9         FBI has been sort of a liaison down there, and she has

10         spoken with another employee of the FBI who is specially

11         trained to interview kids about investigations.

12    Q    Okay.  And she's 17 now?

13    A    Correct.

14    Q    And she turns 18 in October?

15    A    Correct.

16    Q    Okay.  Any evidence whatsoever that Mr. Paauwe ever touched

17         her?

18    A    No.

19    Q    Any evidence that he's ever been in the same state as her?

20    A    I don't have any evidence that he was.

21    Q    You showed us a map, I think you indicated that they were

22         talking about prices for airline tickets?

23    A    Correct.

24    Q    Was any airline ticket ever purchased?

25    A    Not to my knowledge.
```

1    Q    You talked a lot about photos that were taken of G.L.  Who

2         took those photos?

3    A    Presumably G.L.

4    Q    Okay, Mr. Paauwe never took a photo of G.L.?

5    A    Correct.

6    Q    Okay.  He received photos?

7    A    That's correct.  He requested photos.

8    Q    And did you look through all the photos?

9    A    Yes.

10   Q    All right.  Can you put a timeframe on when the photos,

11        from when they first started to when they ended?

12   A    The first photos that I was able to view and view the dates

13        associated with it was the beginning of March of 2018, and

14        for the last ones were into December of 2018.

15   Q    So all last year?

16   A    Correct.

17   Q    Okay.  And so she would have been 16 and then 17 during the

18        course of this photo chain?

19   A    Could -- photos that I reviewed.

20   Q    All right.  And all of the photos were selfies?

21   A    For the most part.  There was a couple of photos taken by a

22        third party.

23   Q    There was?  Who is the third parties?

24   A    I'm not sure.

25   Q    Okay, so there was someone down in Florida that took her

1           picture?

2    A     Yes.

3    Q     Okay, and she consented to that?

4    A     Not any of the photos that constituted CP, but there were

5          certain pictures that she probably had -- she had in her

6          possession somehow of her that she had sent up.

7    Q     So they are clothed photos, not for a sexual purpose?

8    A     I don't know what purpose they were, but they were -- they

9          were clothed.

10   Q     Okay.  All right, so let's talk about this school.  Do you

11         have any evidence whatsoever that Mr. Paauwe has ever

12         touched H.R.?

13   A     No.

14   Q     All right, I assume you talked to Grand Rapids Schools?

15   A     Yes.

16   Q     Did they indicate that he'd ever been admonished or talked

17         to about speaking inappropriately to a child?

18   A     They did not indicate that.

19   Q     Did they have any allegations of misconduct that they

20         shared with you when you spoke with them?

21   A     None that they shared.

22   Q     Okay, and you've said you found some pictures, right?

23   A     Yes.

24   Q     But you have no -- and in those pictures there's none where

25         Mr. Paauwe is doing anything to a child or anything like

1          that?

2     A    Correct.

3     Q    All right, so let's talk about so in November you're doing

4          the undercover work, right?

5     A    Correct.

6     Q    And that's November of 2018?

7     A    Yes.

8     Q    And at that time you learn that there's at that point

9          someone that's communicating with you who -- as you act as

10         a 33 year old woman?

11    A    Correct.

12    Q    Okay.  And does that end around November of 2018?

13    A    Yes, it does.

14    Q    Okay.  And then you obtained subpoena information?

15    A    Correct.

16    Q    And at some point you went to talk to Mr. Paauwe because

17         you learned that it was his IP address that was connected

18         to that account?

19    A    That's true.

20    Q    Okay.  And you went to his home?

21    A    Yes.

22    Q    And he was there?

23    A    Yes.

24    Q    He let you in?

25    A    Yes.

—44—

1  Q  Okay, and you -- you said you wanted to talk to him?

2  A  Correct.

3  Q  And he agreed?

4  A  Yes.

5  Q  Now he acknowledge that had he -- the misconduct in

6     relation to these conversations with the 33 year old woman?

7  A  Yes.

8  Q  Okay.  He acknowledged that he had an addiction to

9     pornography?

10  A  Yes.

11  Q  He told you that he had looked at and possessed child

12     pornography?

13  A  Correct.

14  Q  He told you that he had an interest in I think what you

15     said was mid-teenage girls?

16  A  I think that was one of his phrases.

17  Q  Okay.  And he told this, all of this to you voluntarily?

18  A  Correct.

19  Q  Okay, you didn't have to twist his arm or anything?

20  A  No.

21  Q  Okay.  He consented to a search of his phone?

22  A  Yes.

23  Q  All right, and you took his phone?

24  A  Yes.

25  Q  And then at the end of that conversation, well, he told you

1       that you might find some stuff on his phone because he used

2       his phone to look at pornography?

3   A   Yes.

4   Q   Okay, and that's one of the reasons you searched it, right?

5   A   Correct.

6   Q   At the end of that conversation he said he was going on a

7       trip?

8   A   Yes.

9   Q   And he was leaving the state?

10   A   Yes.

11   Q   And he was going to go to Colorado?

12   A   Correct.

13   Q   Okay, and you let him go?

14   A   Yes.

15   Q   Okay, you didn't arrest him?

16   A   That's correct.

17   Q   Didn't go get a complaint?

18   A   Nope.

19   Q   Didn't go see the prosecutor?

20   A   No.

21   Q   Okay.  All right, so then you look at the phone and, you

22       know, found some offensive material, right?

23   A   Correct.

24   Q   And then you talked to him again after he came back from

25       his trip?

1    A    Yes.

2    Q    And that was January 8th?

3    A    Yes.

4    Q    And did you call him up and say come on down to the FBI's

5         office?

6    A    Yup.

7    Q    Okay, and he came?

8    A    Yes, sir.

9    Q    You didn't have to go get him?

10   A    Correct.

11   Q    Didn't even have to go out to his house?

12   A    Correct.

13   Q    He was nice enough to come see you guys?

14   A    Yes.

15   Q    And you're on a task force so you met at the FBI building

16        on Ionia, right?

17   A    Correct.

18   Q    Okay.  And he came through security?

19   A    Yes.

20   Q    Sat down with you?  He agreed to speak with you again?

21   A    Yes.

22   Q    Okay.  He again admitted that he had possessed child

23        pornography?

24   A    Yes.

25   Q    And then he also told you that he had been having this

---47---

1    conversation with G.L.?

2  A    Correct.

3  Q    And it had been going over a course of, I think he said

4    over a year?

5  A    Yes.

6  Q    He gave you user names and passwords to his devices?

7  A    Correct.

8  Q    And he acknowledged that he had been sending pictures back

9    and forth with G.L. as well, correct?

10  A    Correct.

11  Q    All right.  And at the end of that conversation you did

12    arrest him?

13  A    Correct.

14  Q    On state charges?

15  A    Yes.

16  Q    Okay, and he was brought over to the Kent County Jail?

17  A    Correct.

18  Q    And he appeared before a magistrate?

19  A    Yes.

20  Q    And the magistrate considered whether or not to place him

21    on a bond?

22  A    Yes.

23  Q    And he was placed on a $5,000 bond?

24  A    Yes.

25  Q    Okay, and then he also could not see computers, contact the

1        victim or anyone else under the age of 18, and he couldn't

2        have any cell phones, correct?

3   A   Correct.

4   Q   All right, now since that time of January 8th he's been on

5        bond?

6   A   Yes.

7   Q   Do you have any information that he's violated his bond in

8        any way?

9   A   I do not.

10   Q   He's been living at home?

11   A   I don't know.

12   Q   Okay.  Have you been surveilling him at all?

13   A   I have not.

14   Q   Okay.  Do you have any reason to doubt that he's been

15        living at home?

16   A   I don't know one way or the other.

17   Q   Do you know whether or not he's been put on leave from the

18        public school?

19   A   Yes.

20   Q   Okay, so he's not working?

21   A   Correct.

22   Q   He's not anywhere near children?

23   A   I couldn't tell you that.

24   Q   Well, as part of his bond he's not anywhere near children,

25        right?

```
 1    A    Yes.

 2    Q    And he can't -- and he hasn't violated his bond, to your

 3         knowledge?

 4    A    Not to my knowledge.

 5    Q    Okay.  Do you happen to know anything about his military

 6         background?

 7    A    I know that he has military background.

 8    Q    Okay.  Do you know how many tours he served in the Middle

 9         East?

10    A    I do not.

11              MR. BORGULA:  Nothing further, your Honor.

12              THE COURT:  All right, any redirect, Mr. Reust?

13              MR. REUST:  Very, very briefly, your Honor.

14                       REDIRECT EXAMINATION

15    BY MR. REUST:

16    Q    Agent Siemens, what was Mr. Paauwe charged with in Kent

17         County?

18    A    Possession of child pornography.

19    Q    So that's all the Court was considering in setting his bond

20         there?

21    A    Correct.  There was another charge for using a computer,

22         but it's --

23    Q    Okay.

24    A    -- it was hand in hand with that possession.

25    Q    It was all related to possession of child pornography, not
```

```
 1              production of child pornography or his relationship with

 2              G.L.?

 3    A    That's correct.

 4    Q    When did the interviews of G.L. actually occur?

 5    A    Late January.  I believe in the -- maybe the 29th.  It was

 6              late January and another one in late February.

 7    Q    So the information we discussed about what G.L. disclosed,

 8              that information wasn't known at the time that his bond was

 9              set in the county?

10    A    That's correct.

11                   MR. REUST:  Thank you, Agent Siemens.

12                   THE COURT:  Any recross?

13                   MR. BORGULA:  I'd like to follow up.

14                   THE COURT:  Okay.

15                        RECROSS-EXAMINATION

16    BY MR. BORGULA:

17    Q    He told you that he'd been having a conversation with G.L.

18              in your January interview, right?

19    A    Correct.

20    Q    And he told you that they have been transferring pictures

21              back and forth?

22    A    Yes.

23    Q    And he told you that you'd probably find that on his phone?

24    A    I believe so, yes.

25    Q    Okay, so you did have information about the relationship
```

—51—

1          with G.L. at the time his bond was set?

2     A    We knew the existence of the relationship, but not any of

3          the details.

4     Q    Well, you knew about the pictures going back and forth?

5     A    Correct.

6     Q    And you knew she was a minor under the law, right?

7     A    Correct.

8     Q    Okay, and when we appeared the first appearance in court,

9          the prosecutor knew about it because you told him, right?

10    A    Probably.

11    Q    Okay.  So when the bond was set, everybody, including the

12         prosecutor, knew about the information related to G.L.,

13         maybe not all of the details, but he certainly knew the

14         existence and the fact that pictures had been sent back and

15         forth?

16    A    The identification, the positive identification of G.L. I

17         would have to jog my memory more than I can at this moment.

18         That probably took place after his arraignment, after

19         that -- that bond would have been posted.  The existence of

20         her -- I mean we were aware of her existence, but we did

21         not -- we could not positively I.D. who she was or if she

22         had a driver's license or maybe she was 12 or maybe she was

23         20.  We didn't have any of those specific details.

24    Q    Other than he told you that she was 17?

25    A    Correct.

1    Q    So at the time of the preliminary exam, certainly the

2         prosecution knew this issue was out there, right?  That

3         comes about a week after the arraignment?

4    A    I would think so, yes.

5    Q    Okay, and that is in mid January?

6    A    That sounds about right.

7                   MR. BORGULA:  Okay.  Thank you, your Honor.

8                   THE COURT:  All right.  Anything further,

9         Mr. Reust?

10                  MR. REUST:  Nothing further.

11                  THE COURT:  You may step down, thank you, sir.

12                  THE WITNESS:  Thank you, your Honor.

13                  (At 4:47 p.m., witness excused.)

14                  MR. REUST:  No further evidence from the

15        government, your Honor.

16                  THE COURT:  All right, thank you.  Mr. Borgula,

17        do you have any proffer or evidence you wish to be put on?

18                  MR. BORGULA:  I don't have any witnesses, your

19        Honor.  I do have some proffer.  I can work it into my

20        argument, if you would prefer to -- I just --

21                  THE COURT:  That would --

22                  MR. BORGULA:  I'm just going to --

23                  THE COURT:  That would be fine, okay?

24                  MR. BORGULA:  And then if the government wants

25        to go first, then I'll respond and --

1                THE COURT:  Well, I usually ask them to go

2     first, so --

3                MR. BORGULA:  Me, or --

4                THE COURT:  No.  The -- the government.

5                MR. BORGULA:  That's what I figured, yeah.

6                THE COURT:  Yeah.  Go ahead, Mr. Reust.

7                MR. REUST:  Thank you, your Honor.  I'll be

8     brief.

9                This is a case, the charges against Mr. Paauwe

10    were, four of the five charges carry a presumption of

11    detention under 3142(e)(3)(E), and additionally, your

12    Honor, the government's indicated to your Honor that

13    there's no concern that he's a flight risk.  We acknowledge

14    that he has showed up, we acknowledge that he's done that

15    voluntarily while he was on bond in the county.

16                The concern with Mr. Paauwe is his danger to the

17    community.  This is somebody that had the trust of the

18    school, that had the trust of his spouse, and he engaged in

19    activities and actions towards children under all of their

20    noses.  These are people that presumably paid attention to

21    Mr. Paauwe and were much closer to Mr. Paauwe than the

22    Court is going to be able to be in supervising him, and he

23    was doing all of these things under their noses.

24                Additionally, your Honor, Mr. Paauwe, at least

25    on my read of the Pretrial Services Report on page three

1      did not disclose that he had sought counseling, it sounded

2      like from Agent Siemens' testimony, that it was potentially

3      related to the pornography addiction prior to his charges

4      in the county, but as Agent Siemens testified, he did

5      disclose seeking counseling or a psychiatrist at some point

6      in approximately the last five years, I believe was Agent

7      Siemens' testimony, and it does not appear that that

8      information was disclosed to Pretrial Services.  I realize

9      they were rushed in creating this report, but it appears to

10     be additional deception, an additional concern regarding

11     his danger to the community.

12            Additionally, your Honor, I understand that the

13     defense position is going to be he hasn't been hands-on

14     with a kid.  He does not need to be hands-on with a kid to

15     be a danger to this community.  In fact he's probably more

16     dangerous when he's not able to touch the children.

17            In looking at his communications to G.L., he

18     solicited approximately a hundred images of child

19     pornography from a child that was multiple states away,

20     including having her cut herself, or at least on her

21     statements and then photographs that seemed to support that

22     she was cutting herself, and had thoughts at least of

23     traveling to her, as Government's Exhibit 3 depicts.

24            Additionally, your Honor, he took actions at his

25     school to put children there at risk.  He may not have been

1    hands-on with the children, but he masturbated and

2    ejaculated on one of his student's desks.  That creates a

3    risk and a danger whether he actually sexually touches that

4    child or not.

5         And finally, your Honor, G.L. disclosed a video

6    or a photograph that Mr. Paauwe had sent her soliciting a

7    first or second grader to stick their hands down their

8    pants and then in their mouth.  He does not need to touch

9    these children to abuse them.  He doesn't need to touch

10    them to be a danger to the community, and people that have

11    been very close to Mr. Paauwe had no idea this was going on

12    right under their nose.  Thank you, your Honor.

13         THE COURT:  Thank you.  Mr. Borgula, let me hear

14    from you.

15         MR. BORGULA:  Thank you, your Honor.

16         To address the mental health issue, the first

17    sentence of page three of Officer Osborn's report indicates

18    that he disclosed he had been in counseling, so I don't

19    know that that's a -- the counseling was for depression,

20    and certainly part of that depression he discussed is porn

21    addiction.  So he has been trying to make attempts to

22    address the issues that he's dealing with.  Your Honor, it

23    is the government's burden to show by clear and convincing

24    evidence that Mr. Paauwe is a danger to the community, in

25    other words there are no conditions that would reasonably

1      assure the safety of any persons or of the community, and

2      they're a presumption, but that presumption is easily

3      rebutted.  And in this case there are several factors I

4      know the Courts are going to consider, and we support the

5      recommendational probation which is release, and I think

6      it's appropriate here.

7              To address the nature and circumstances of the

8      offense, we're not going to contend that this isn't

9      disgusting allegations, poor behavior.  It's awful.  All

10     right, the words that are used, the videos, it's awful.

11     But not to make light of it or -- but the G.L. in this case

12     is on the old side of minor.  She is 17.  Mr. Paauwe, if

13     she -- if they had been in the same room and they had had

14     sex, that is not a crime in the State of Michigan or under

15     federal law.  He can have sex with her, he just can't have

16     a video of her.  So that -- I mean I -- obviously, we're

17     not condoning the behavior of sending dirty pictures back

18     and forth, but she is 17.  And the reason the State of

19     Michigan thinks that 17 is not statutory rape is because

20     they believe that they can -- they know when they can

21     consent, and the age is 16 in Michigan.

22              So you have a victim here, the real victim who

23     is a real person, and we acknowledge that, who is

24     voluntarily sending these pictures.  I know that the

25     allegation is that he's enticing and coercing, but that's

1    something that's going to be left for trial for a jury

2    whether or not he coerced these images.  He stands here --

3    sits here as an innocent man right now, and he never even

4    touched this particular young woman.  There's no allegation

5    whatsoever.

6         Now there's a map and some talk of maybe they

7    would get together, but he was talking to her for over a

8    year and there's no evidence whatsoever that they'd ever

9    even been in the same state.  The crime here, according to

10   the government, is the pictures going back and forth.  I

11   mean ironically, if they actually did get together and

12   they'd had sex, consensual sex in Michigan, it wouldn't be

13   a crime.  The pictures are a crime, but not the actual

14   sexual contact.

15        So while we're not -- I'm not trying to belittle

16   or make light of the fact that it's not appropriate

17   certainly to have child porn or to send pictures back,

18   certainly it's immoral, I mean he's a married man, he can't

19   do that, but she is 17.

20        With regard to his character, setting aside the

21   nature and circumstances of the offense, you know, if

22   you -- if you carve out this, this pattern of behavior,

23   this is one heck of a man.  He's lived a stellar life, no

24   criminal history, nothing.  He was a marine, active duty in

25   Iraq and Afghanistan, he was close to people that died,

1      IEDs, and while he wasn't in hot sniper fire or hot fire,

2      but he was definitely in harm's way.  He was honorably

3      discharged.

4              His wife, Tracy, is here, other members of his

5      family are here, and they know -- they knew all this before

6      we walked in the courtroom today.  They knew the

7      circumstance of what's going on, and they still support

8      him.  And the reason they still support him is because they

9      know he does have strong character and he's sick.  There's

10     something that went wrong between the time of his service

11     and now, obviously.

12             He -- he confessed to all this behavior, you

13     know, it's going to be very difficult to say he didn't take

14     those pictures of himself and send them to the 17 year

15     old -- the 17 year old, he didn't receive them back.  He's

16     not going to say that because if you look at what he did

17     was he came in and voluntarily acknowledged his conduct.

18             He's lived in Grand Rapids, West Michigan his

19     whole life, other than the time he was in the Middle East.

20     There's no history of sexual abuse either on him or by him

21     that the police have been able to produce.  I'm sure they

22     would have told the Court if he had a history of lingering

23     around small children.

24             He's got no issues with drug or alcohol, and if

25     you look at his record of appearance at court proceedings,

1        he was on a $5,000 bond.  A neutral magistrate looked at

2        that, they knew the information, they had this information,

3        and I can attest to the Court that I talked to the county

4        prosecutor about the fact that they knew about this video

5        and that occurred a week before the preliminary exam, which

6        occurred a week after his arraignment.  And so I talked

7        specifically to the prosecutor about this and whether or

8        not he was going to be charged.

9              He waived the preliminary exam, got bound over

10       before Judge Rossi.  We were proceeding there and in

11       discussions.  All that time he's appearing as directed,

12       he's complying with his bond, which included no telephone,

13       to cell phone whatsoever, no Internet, no contact with any

14       minors.  Perfect record of compliance.  Whenever I needed

15       to speak with him I'd contact his wife, because that was

16       the only way to get a hold of him, and she would make

17       arrangements for him to be there, and he was always there.

18             He showed up at 9:15 this morning.  He heard

19       there was a federal indictment.  Obviously, very

20       disappointed about that.  But he showed up voluntarily and

21       turned himself in.  And, you know, when you're looking at

22       whether or not he's actually a danger, whether or not the

23       Court can fashion some sort of bond, look at how he's

24       already done.  He's already been on bond for nearly two

25       months.  A neutral magistrate issued the bond and it

1        worked.  If the Court I think, as it's required to do,

2        wants to add on a tether, certainly the Court can do that.

3                    THE COURT:  I think the Court has to.

4                    MR. BORGULA:  Yeah, I think the Court has to as

5        well under the Adam Walsh Act.  But I think there are

6        conditions of bond that will assure that he'll show up and

7        then assure the safety of the community.  He's had no

8        contact with this individual.  The Court has not heard

9        anything like that, no texts or phone calls or whatever to

10       the 17 year old, nothing at all, no indirect or direct

11       contact.  And when he was asked about what had happened, he

12       told the FBI -- well, the FBI Task Force.  And that's an

13       indication to the Court of his response to direction from

14       authority.

15                    He's a military guy.  He's got officers asking

16       him what he did, and he owned up to it.  He told them

17       exactly what happened.  We're asking for an opportunity

18       that he be out on bond to address the charges, prepare a

19       defense, he can stay at home with his wife.  He could be

20       put on a tether, he'll have no contact whatsoever with

21       anyone under 18.  They have no children.  He has no reason

22       to be at events or activities where children are present,

23       and I think if the Court applies those conditions that

24       probation officer is recommending, I think it will assure

25       the safety of the community.  Thank you, your Honor.

1          THE COURT:  All right, thank you.  Any brief

2     rebuttal, Mr. Reust?

3          MR. REUST:  Just to address a few of the

4     arguments, your Honor.

5          In regards to the Pretrial Services statement in

6     that first sentence, that appears to be talking about

7     counseling sought after he was arrested by Kent County,

8     because that was obviously on January 8th, and it says

9     earlier this year.  And as Agent Siemens testified, his

10    statements about counseling were from earlier before.

11    That's it, your Honor.  Thank you.

12         THE COURT:  All right, thank you.  I am going to

13    release the defendant on bond with many, many conditions.

14    I just told him this morning that he's presumed innocent

15    until he's proven guilty beyond a reasonable doubt.  I know

16    these crimes are considered, they are very disfavored, they

17    seem heinous.  I understand that.  I get that.  But he has

18    no prior criminal history, he has no substance abuse

19    history.  He -- I agree with the government that he is not

20    a risk of flight.  His behavior in response to the

21    investigation, what that signals to me is that he's likely

22    to comply with his conditions of bond, and as I said, they

23    are going to be quite onerous.

24         The government, you know, has put on a pretty

25    strong case in terms of his guilt, but he hasn't been

1       determined guilty yet.  And when I look at everything else

2       that if this was not a sexual crime, there's no way he

3       would be not on bond, I mean given his history.  And I also

4       note his military history and I -- in terms of the

5       deception about the counseling, sometimes Pretrial Services

6       is told whoppers.  I don't find this one a whopper.  I -- I

7       don't think it's funny, but I just I guess -- so I am going

8       to release him on bond.

9               I'm going to release you on what's called an

10      unsecured appearance bond, Mr. Paauwe, and there's no doubt

11      in my mind that if you have any violations of the bond

12      condition, I will revoke your bond.

13              MR. PAAUWE:  Yes, your Honor.

14              THE COURT:  This is a very hard case, it's a

15      tough case, and I'm going to make your bond in the amount

16      of $20,000.  That doesn't have any -- any effect on you

17      unless you don't show up for a court appearance.  I'm going

18      to also order that you have location monitoring with a

19      curfew to be determined by the United States probation

20      officer per the Adam Walsh Act, that you maintain your

21      residence and do not move unless you have prior approval

22      from your probation officer, that your travel is restricted

23      to the Western District of Michigan, that you surrender

24      your passport and do not obtain a new one.

25              Is Ms. Osborn still here?  Ms. Osborn, do you --

1          who do you want him to surrender his passport to?

2                    MS. OSBORN:  He can surrender it to our office.

3                    THE COURT:  Okay.

4                    MS. OSBORN:  Thank you.

5                    THE COURT:  Will you surrender that to your

6          probation officer's office.  That you possess no dangerous

7          weapons, that you have no computer or Internet access

8          whatsoever, either by phone, iPad, laptop, that you do not

9          view or possess pornographic materials, that you have no

10         unsupervised contact with minors, that you definitely have

11         no contact with any victims of this or any witnesses,

12         anyone you think might be a witness.

13                   Other than G.L., is there anybody else you're

14         aware of, Mr. Reust?

15                   MR. REUST:  No identified victims --

16                   THE COURT:  Okay.

17                   MR. REUST:  -- that I know of, your Honor.

18                   THE COURT:  That you avoid locations where

19         minors are generally found, that is playgrounds, schools,

20         any place where you know that minors are going to be

21         around, that you have mental health counseling as directed,

22         and that you report any law enforcement contact to your

23         probation officer within -- what's the timeframe?  It's 48

24         hours?  24 hours?

25                   MS. OSBORN:  I think it's generally 24 hours,

1          your Honor.

2                    THE COURT:  Okay, within 24 hours.  Any other

3          conditions, Mr. Reust, that you think are appropriate?

4                    MR. REUST:  Was there any -- was home detention

5          discussed, your Honor?

6                    THE COURT:  What I -- what I put him on, which

7          is what I was told by the pretrial officer is required by

8          the Adam Walsh Act, is location monitoring with a curfew to

9          be determined by the U.S. Probation Office.  They take

10         that, that's specifically, as I understand it, in the Adam

11         Walsh Act.

12                   MR. REUST:  I think that could be right.

13         Actually I would request home detention, leave it to your

14         Honor to decide on that.

15                   THE COURT:  Ms. Osborn, you told me you think

16         you cannot do home detention under the Adam Walsh Act; is

17         that correct?

18                   MS. OSBORN:  The Adam Walsh Act specifically

19         says curfew, your Honor.  When we have home detention and

20         curfew, they kind of -- they don't mesh, and so we put --

21         the act actually says curfew.

22                   THE COURT:  All right.  So I'm going to go along

23         with the statute, okay?  This has been explained to me many

24         times, but I still don't quite understand it.  But I'm

25         going to trust the Pretrial Services officer.  Yes, and he

1 may be released today and report first thing tomorrow.

2 Nine o'clock, Ms. Osborn?

3     MS. OSBORN:  8:30, your Honor, with officer

4 snow.

5     THE COURT:  8:30 to have tether set up.

6     MR. PAAUWE:  Yes, your Honor.

7     THE COURT:  Anything further from your point of

8 view, Mr. Reust?

9     MR. REUST:  No, your Honor, thank you.

10     THE COURT:  All right.  I -- if you would sign

11 that on the signature pad, it will appear on the bond form.

12 We'll give you a copy of that to take with you today.  You

13 should go back to the Marshal's Office and you'll be

14 released from there, and check in with Ms. Osborn on the

15 first floor before you leave here today.

16     MR. PAAUWE:  Yes, your Honor.

17     THE COURT:  And I'm placing confidence in you

18 with your background and your behavior to-date not related

19 to the charges, but your candor.  I want you to know I'm

20 placing a lot of confidence in you.

21     MR. PAAUWE:  Yes, ma'am.

22     THE COURT:  And I also place confidence in

23 Mr. Borgula, who is a former prosecutor, that he will make

24 sure that you comply with your conditions of bond.  You

25 could be held in contempt of court if you do not.  I

1      already told you I will revoke your bond if there are any

2      violations of any condition, and I -- we do a pretty good

3      job of supervising our bond releasees here.

4              So anything further from your point of view,

5      Mr. Reust?

6              MR. REUST:  No --

7              THE COURT:  Yes?

8              MR. REUST:  -- your Honor, thank you.  Oh.

9              UNIDENTIFIED MALE:  He gets an oath, judge.

10             UNIDENTIFIED MALE:  You swear him in on his

11     bond.

12             THE COURT:  Oh, that -- I -- I was going to give

13     him a copy of his bond papers first, but yes.  Thank you so

14     much.  You've helped me with that before.  Okay.

15             I don't know if I told you this, Mr. Paauwe, but

16     you could also be charged with a separate federal crime if

17     you fail to show up for a court appearance called bail

18     jumping, which I don't think you want to have happen.

19             MR. PAAUWE:  No, your Honor.

20             THE COURT:  Thank you.  Would you kindly stand

21     and raise your right hand and my deputy clerk will swear

22     you on your bond.

23             THE COURTROOM DEPUTY:  Do you swear or affirm

24     that you will appear as ordered by the Court, on penalty of

25     forfeiting your bail?

1                MR. PAAUWE:  Yes.

2                (At 5:08 p.m., Defendant sworn.)

3                THE COURTROOM DEPUTY:  Please be seated.

4                THE COURT:  And Mr. Reust, I'm going to ask

5  Ms. Lenon to hand you back your exhibits.  Thank you.

6                MR. REUST:  Thank you, your Honor.

7                MR. BORGULA:  Thank you, your Honor.

8                THE COURT:  Do the bond papers appear to be in

9  order to you, Mr. Borgula?

10               MR. BORGULA:  They do, your Honor.

11               THE COURT:  Okay.  All right, court is

12  adjourned.

13               MR. BORGULA:  Thank you, your Honor.

14               MR. REUST:  Thank you, your Honor.

15               (At 5:09 p.m., end of proceedings.)

16                     -ooOoo-

17

18

19

20

21

22

23

24

25

```
                    CERTIFICATE OF REPORTER




STATE OF MICHIGAN      )
                       )  ss.
COUNTY OF KENT         )




        I, Bonnie L. Rozema, CER, do hereby certify that this

transcript, consisting of 69 pages, is a complete, true, and

accurate transcript, to the best of my ability from the audio

recordings, of the proceedings and testimony held in this case

on February 28, 2019.

        I do further certify that I prepared the foregoing

transcript.




/s/  Bonnie L. Rozema

Bonnie L. Rozema, CER-5571
2700 92nd Street, S.W.
Byron Center, MI  49315
(616) 878-9091


Notary Public in and for
Kent County, Michigan
My commission expires:
March 26, 2025
Acting in the County of Kent
```