```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF MICHIGAN
2                             SOUTHERN DIVISION

3        _____

4        UNITED STATES OF AMERICA,

5                         Plaintiff,

6             v.                      CASE NO:  1:19-CR-41

7        PHILIP GORDON PAAUWE,

8                         Defendant.

9        _____/

10

11                            *   *   *   *

12                         SENTENCING HEARING

13                            *   *   *   *

14

15       BEFORE:    THE HONORABLE PAUL L. MALONEY
                    United States District Judge
16                  Kalamazoo, Michigan
                    September 12, 2019
17
         APPEARANCES:
18
                 APPEARING ON BEHALF OF THE PLAINTIFF:
19
                 DANIEL MEKARU
20               Assistant United States Attorney
                 P.O. Box 208
21               Grand Rapids, Michigan  49501-0208

22               APPEARING ON BEHALF OF THE DEFENDANT:

23               MATTHEW GEORGE BORGULA
                 RACHEL LAURA-HEISS FRANK
24               15 Ionia Avenue, S.W., Suite 520
                 Grand Rapids, Michigan  49506
25
```

1                    Kalamazoo, Michigan

2                    September 12, 2019

3                    at approximately 10:29 a.m.

4                         PROCEEDINGS

10:29:33  5         THE COURT:  This is File Number 19-41; <u>The United</u>

6    <u>States of America vs. Phillip Paauwe</u>.  This matter is before

7    the Court for sentencing.

8         The Court's file reflects that on June 4, 2019, the

9    defendant pled guilty before Magistrate Judge Ray Kent to

10:29:48 10   the offense of coercion and enticement of a minor, contrary

11   to 18 U.S. Code 2422(b).  The plea was accepted by this

12   Court on June 21st, 2019.  The Court accepts the plea

13   agreement finding the charges pled to adequately reflect the

14   seriousness of the actual offense behavior.

10:30:07 15        There are objections to the advisory guideline

16   scoring, which the Court will address momentarily.  The

17   presentence report scores this case at Offense Level 42,

18   Criminal History Category I, resulting in an advisory

19   guideline range of 360 months to life.

10:30:25 20        The record should reflect that Assistant United

21   States Attorney Dan Mekaru represents the government.

22   Attorneys Borgula and Frank represent the defendant.  The

23   defendant is present in person.

24        Mr. Borgula, have you had ample opportunity, sir,

10:30:39 25   of reviewing presentence report with your client?

1           MR. BORGULA:  I have, your Honor.

2           THE COURT:  Subject to your objections, do you

3      concur in the advisory guideline range?

4           MR. BORGULA:  Yes, your Honor.

10:30:46   5           THE COURT:  Any other objections to the report?

6           MR. BORGULA:  None.

7           THE COURT:  Thank you.

8           Mr. Paauwe, you've had ample opportunity of

9      reviewing the presentence report with your lawyers?

10:30:53  10           THE DEFENDANT:  Yes, your Honor.

11           THE COURT:  Are you satisfied with their work and

12      representation of you?

13           THE DEFENDANT:  I am, your Honor.

14           THE COURT:  Thank you.

10:30:58  15           Mr. Mekaru, do you concur in the advisory guideline

16      range?

17           MR. MEKARU:  I do, your Honor.

18           THE COURT:  All right.  Thank you.  Are you moving

19      third level?

10:31:06  20           MR. MEKARU:  Yes, your Honor.

21           THE COURT:  That motion is granted.  That does not

22      change the advisory guideline range, because the Court

23      anticipated the making of the motion and the Court's

24      granting of it.

10:31:14  25           Mr. Borgula, I'll hear you on your objection, sir.

1    Go ahead.

2         MR. BORGULA:  Thank you, your Honor.

3         Your Honor, I would first like to note that with

4    regard to Paragraph 85 of the presentence report, the

10:31:27  5    probation officer has identified that as an objection to the

6    two levels for the distribution of child pornography.  The

7    defense has actually never objected to that.  We did ask for

8    clarification from the government as to its proofs.  We

9    received that clarification, and to the extent there is an

10:31:42 10    objection there, we are withdrawing that.

11         THE COURT:  Thank you, sir.

12         MR. BORGULA:  I would next like to go to our

13    objection to the five levels under 4B1.5, which applies when

14    the defendant engage in a pattern of activity involving

10:31:57 15    prohibited sexual conduct.  We have filed a memorandum on

16    that issue, your Honor.  And I will try not to repeat my

17    arguments there, but I would like to address some of the

18    response that was provided by the government.

19         Your Honor, as this Court is aware, the law is very

10:32:13 20    clear until the Sixth Circuit decides that it isn't.  And I

21    think the reason we have objected here is because under

22    United States vs. Havis, the guidelines become less clear,

23    at least from our point of view, on each individual

24    guideline that involves an enhancement.  And here, we are

10:32:34 25    questioning whether under current law the guidelines should

apply in this case, because it's only one minor as opposed
to minors as is stated in the substantive part of the
guideline.  We concede that the law was pretty clear before
Havis, that the commentary suggests that this applies even
in the case when it's only one minor so long as there's
multiple acts involving sexual activity.  We would like to
object at this point, because it's unclear now after Havis
whether or not under Havis the guideline itself, 4B1.5, has
been broadened in scope, because the guideline, the
provision-- the substantive provision only refers to minors
in the plural, whereas it's only the commentary that talks
about the individual minor.  We recognize that there is
certainly caselaw-- prior caselaw that discusses this issue
and that conclusively states that it involves a single
minor, but given that that's only in the commentary and the
courts that have looked at that are interpreting the
commentary, and not the actual substance of the guideline,
we ask that the Court consider not applying that five
levels.  And that five levels is obviously important here,
because it increases the defendant's guideline range over a
decade.

        So under this particular enhancement, the point is
to punish someone who is engaged in a pattern, and that is
the question for the Court:  Does the pattern have to be
multiple instances of sexual activity against just one or

1    many, or does it have to be-- is the point we are trying to

2    stop someone who is sort of a serial pedophile.  And here we

3    would argue that the guidelines-- the substantive guideline

4    talks about minors, meaning multiple convictions in the Sub

10:34:30    5    A or multiple victims in Sub B, recognizing the fact that

6    the law in the past has not been in our favor.

7          In addition, I would like to address the Brattain

8    case, which I know this Court is familiar with, because I

9    believe that that defendant is actually under the

10:34:50   10    supervision of this Court after he was previously under the

11    supervision of Judge Bell.

12          The Brattain case is relied upon by the government

13    to show that Congress has looked at the commentary to these

14    guidelines.  And has indicated that it should apply to a

10:35:09   15    single victim with mul-- when there is multiple instances of

16    sexual activity.  Our response to that is, that case is from

17    2008 and it interprets the 2006 guidelines.  Those

18    guidelines-- and the case only talks about the actual

19    commentary and not the substantive guidelines themselves.

10:35:31   20    So Congress has had-- has since amended the guidelines and

21    has obviously had about 11 years, has not once addressed the

22    fact that the substantive part of the guidelines, the actual

23    guidelines, only refers to minors in the plural, and if they

24    really wanted it to apply to a single victim, they could

10:35:51   25    easily clarify that under the actual guidelines that are

1    reviewed and voted on by Congress.

2           In addition, we would ask the Court to consider the

3    facts of <u>Brattain</u> and the outcome, at least in that Sixth

4    Circuit case.  In that case, Judge Bell sentenced the

10:36:11    5    defendant to 144 months or 12 years in prison, but he

6    refused to apply the enhancement interpreting the commentary

7    to mean only one victim.  And in that case, the defendant

8    had sexually molested his own daughter for seven years, and

9    she was between the ages of three and ten, I believe.  The

10:36:33    10    Sixth Circuit decided that Judge Bell interpreted the

11    commentary incorrectly and that he should have applied the

12    five level enhancement, but they remanded it advising him

13    that hey, the guidelines are advisory, you can do whatever

14    sentence you feel appropriate, and again, he gave 12 years

10:36:51    15    on remand.

16           And I raise that, your Honor, because I would like

17    the Court to consider if under <u>Havis</u> the Court finds that

18    the substantive guideline is not broadened in scope, we

19    would at least ask the Court to consider that under

10:37:12    20    <u>Brattain</u>, the Court still has discretion to interpret the

21    guidelines in a manner consistent with what we hope to be

22    Judge Bell's position and not apply it as opposed to the

23    strict reading of the commentary of the guidelines, which

24    would involve the five level enhancement.

10:37:33    25           THE COURT:  If I understand the essence of the

1    _Brattain_ case, this was is a situation which, as far as I

2    know, is somewhat uncommon, that the Congress actually went

3    in and by statute changed the application notes, correct?

4              MR. BORGULA:  The legislative history, and I read

10:37:51   5    it last night, they talk about the fact that they-- they

6    want it to apply to a single victim.  So, yes.

7              THE COURT:  And it's not common, I think it would

8    be fair to say, where Congress reacts to a decision by a

9    court and goes in and changes not only the-- they can go in

10:38:15  10    and change the substantive guideline for sure, but it seems

11    to me it's unusual for Congress to go back and basically

12    tell the courts hey, you got this wrong, we think the five

13    levels ought to apply to a situation where there is only one

14    victim.  Is your experience different than that?

10:38:39  15              MR. BORGULA:  No, your Honor.

16              THE COURT:  Okay.  All right.  Thank you, sir.

17              MR. BORGULA:  Thank you.

18              THE COURT:  Mr. Mekaru, go ahead, sir.

19              MR. MEKARU:  I think you've hit exactly on point.

10:38:49  20              In the _Havis_ decision what was of concern was the

21    government's request to the court that it defer to the

22    commission's commentary.  And the Sixth Circuit en bank

23    recognized that the guidelines typically themselves-- excuse

24    me, the commentary to the guidelines never passed through

10:39:17  25    the gauntlets of Congressional review or notice and comment.

1    Well, as you've pointed out here, that is not true with

2    respect to this particular commentary and this particular

3    enhancement.  In going to the Brattain decision, it's clear

4    that the Sixth Circuit clearly recognized that Congress went

10:39:44   5    in-- went in not just in general looking at the guidelines

6    as a whole, but went into this particular commentary and

7    made an express legislative directive to say this shall

8    apply to a single victim who has been exploited multiple

9    times.

10:40:03  10        The Havis decision, while is generally of concern

11   regarding the interpretation of a commentary, Brattain

12   settles this.  So really the Havis decision as far as its

13   concerns about legislative Congressional--

14        THE COURT:  Assent?

10:40:31  15        MR. MEKARU:  --notice or comment or review, or

16   assent, that's actually-- that's even a directive in this

17   particular instance.  So I don't see that it has the same

18   application here.  And with respect to a decision about

19   ultimately Judge-- commenting on Judge Bell's decision on

10:40:52  20   the ultimate sentence, that's not with respect to the

21   application of this guideline section.  It may be under 3553

22   for other reasons that we will get to, there may be other

23   arguments with respect to what ultimately is the appropriate

24   sentence, but that is completely different from what is the

10:41:10  25   proper legal interpretation of this guideline and it's

1    application.

2            It's properly scored, your Honor.  It's--  That's

3    without question.  Thank you.

4            THE COURT:  Thank you.

10:41:21  5    Mr. Borgula, go ahead, sir.  Anything further?

6            MR. BORGULA:  I just want to clear up, your Honor,

7    what we were asking about when raising Brattain is whether

8    or not to the Court actually has discretion to interpret the

9    commentary still or whether the Court feels that it is bound

10:41:41 10   by the commentary as if it were substantive law like the

11   actual guideline itself.  It's our position that given

12   Havis, which specifically says that the commentary can be

13   used for interpretation, we believe that the Court has the

14   ability in its discretion to interpret it one way or the

10:42:01 15   other, and we are asking the Court to interpret it

16   consistent with what Judge Bell had previously done and not

17   apply the five level enhancement.

18           THE COURT:  Thank you, sir.

19           Well, the Court fully recognizes the guidelines are

10:42:12 20   advisory to the Court, and if I have an interpretive or

21   policy divergence from the-- either the structure of the

22   guideline itself or the application notes or the commentary,

23   I fully recognize my discretion in making those decisions if

24   I choose.

10:42:36 25           The first objection, at least as originally set

1    forth by the Court's probation officer as it relates to

2    Paragraph 85 has been withdrawn.  That leaves the one

3    objection that we have been talking about this morning.

4         The Court's going to overrule the objection.  This

10:42:54  5    is one of the, in the Court's judgment, rare instances when

6    the Congress of the United States having-- I would also note

7    that this particular guideline provision is as a result of a

8    2003 public act passed by the Congress in which they wrote a

9    statute which was incorporated in the guidelines.  That

10:43:18  10    doesn't happen very often, and in addition to that,

11    adjusting a commentary or application notes directly by the

12    Congress of the United States is also a rarity.  But in any

13    event, the Congressional action on this particular guideline

14    make it clear that it was the intention of Congress that as

10:43:43  15    far as the number of minors who could be victimized and have

16    this particular provision of the guidelines applied, that a

17    single minor was enough.  The Court believes that is totally

18    appropriate for the Congress to do that.  They are the

19    policy makers in the federal government, along with the

10:44:06  20    executive branch of government.

21         I have no quarrel with the Congressional action

22    here, and in light of that guidance, recognizing the Havis

23    case, and its application to district courts in our circuit,

24    it just seems to me that given the Congressional action,

10:44:28  25    that this case is clearly distinguishable from the core

1    holding of the <u>Havis</u> case.  So the objection is overruled.

2    The guideline range becomes 360 months to life.

3         The Court notes for the record the government has

4    filed a sentencing memorandum, which is ECF 30.  The

10:44:52  5    defendant filed a sentencing memorandum with significant

6    attachments which is along with a variance request, which is

7    ECF Document 31.  I have the victim impact statements filed,

8    which is ECF 34.

9         So with that, Mr. Borgula, just to make absolutely

10:45:17  10    sure, no other objections; is that correct, sir?

11         MR. BORGULA:  That is correct, your Honor.

12         THE COURT:  All right.  Thank you.

13         All right.  Mr. Mekaru, it's my understanding that

14    you have some victims who wish to address me?

10:45:40  15         MR. MEKARU:  I do, your Honor.

16         And your Honor, we filed a supplemental sentencing

17    memorandum, ECF 32, and we had asked for the Court to

18    consider restitution.  It was a--

19         THE COURT:  Thank you.

10:45:55  20         MR. MEKARU:  --brought late to probation and the

21    Court's attention.

22         THE COURT:  I have read it.  Thank you.

23         MR. MEKARU:  I don't know whether you would like to

24    address that.

10:46:03  25         THE COURT:  Well, why don't we do that with lawyer

```
 1    allocution?
 2              MR. MEKARU:  Thank you, your Honor.
 3              We do have individuals who would like to speak.
 4              THE COURT:  They may come forward.
 5              All right.  Mr. Mekaru, you may introduce the
 6    individuals that wish to address me.
 7              MR. MEKARU:  Your Honor, I would like to use
 8    initials G.L. and her mother.  Her mother is going to speak
 9    first.
10              THE COURT:  You may proceed, ma'am.
11              Good morning.
12              VICTIM G.L.'s MOTHER:  My daughter is the victim in
13    this case.  She was just 15 years old when the defendant
14    began preying on her.  I knew nothing of his existence until
15    she was 17.  Being a stay-at-home mother, I'm very close
16    with all of my children.  I spend a lot of time with each of
17    them.  Naturally I tend to notice when something is off.  We
18    had just made a big move across the country, and shortly
19    after that, I started observing changes in my daughter.  She
20    does have a history of emotional disorders that for a time
21    had be successfully managed with therapy and medication.
22    She also has a history of self harm.  So I became
23    increasingly concerned when I noticed her withdrawing from
24    me, her friends, and the rest of our family.
25              Over the course of about a year, I watched her
```

1    completely change.  I didn't know it at the time, but this

2    is when the defendant had a great deal of control over her.

3    She had a new found hate for her body.  She developed a

4    dangerous eating disorder and lost a great deal of weight in

10:48:40  5    a very short period of time.  She lost interest in things

6    she used to love.  My bright, sweet, beautiful girl was

7    becoming a shell of her former self.

8         After we discovered Philip and began the process of

9    getting my daughter help, things got drastically worse.  We

10:49:05  10    discovered she had a suicide plan in place.  She was at a

11    point where her teenage mind that was so moldable, couldn't

12    carry the weight of all of the mess he brought into her life

13    anymore.

14         Through questioning and therapy, we discovered that

10:49:38  15    she had been forced to physically harm herself.  We also

16    found out that Philip tirelessly tried to get her to do

17    unthinkable things to her baby sister, who was just four

18    years old.  She was exposed to his evil fantasies that she

19    still has nightmares about.  All of these things done to my

10:50:06  20    innocent daughter in 15 months have completely changed her

21    forever.  She no longer trusts people.  She is afraid to be

22    alone.  She worries greatly about her little sister, almost

23    constantly.  She will never experience the innocence that

24    she once had before she became his victim.  She was a

10:50:32  25    15-year-old girl that had not yet had her first kiss when

1   she began communicating with Paauwe.

2           He did his best to completely corrupt her.  He

3   exposed her to a twisted, evil, sick, and violent form of

4   sexuality before she even had her first boyfriend.  She will

10:50:55   5   never have the opportunity to erase all of the images and

6   ideas he fed into her.  She will enter into future

7   relationships with painful memories of being manipulated and

8   abused by a man old enough to be her father.  She will need

9   therapy indefinitely.

10:51:13   10           Our family was turned upside down because of the

11   selfish actions of a man 1,300 miles away from us.

12           As parents, Philip made us feel like we failed our

13   daughter.  We have always tried to protect her, but he found

14   a way around us to continually abuse her.  Through her

10:51:43   15   phone, he snuck into her bedroom, her school building, our

16   church, our family vacations, everywhere she was and

17   secretly controlled our daughter.  The sense of security

18   that he robbed us of is hard to regain.  We have questioned

19   ourselves over and over again.  How could we have prevented

10:52:09   20   this?  How could we have protected our daughter from all of

21   the pain that he inflicted on her, physical pain and mental

22   pain.

23           Philip Paauwe has changed our family.  First and

24   foremost our daughter, but in reality our entire family has

10:52:26   25   been affected.  Our other children have been made aware of

the situation and it's been impossible to hide.  She missed

a full quarter of her junior year in high school.  She was

so paralyzed with fear after giving her testimony to the

FBI, that she couldn't leave home.  Her therapist had to

meet with her in our home because of the crippling anxiety

and depression that followed.  She was scared all of the

time.  She knew Philip knew our address, as he had planned

to visit her over spring break.

She made us keep all of our blinds closed on our

windows and she repetitively checked all of the locks.  We

recently moved into a new home, and instead of being excited

about her new bedroom, etcetera, she was relieved Philip no

longer knew exactly where to find her.  The fear hasn't

completely subsided because she knows he has been free while

awaiting sentencing.

Your Honor, the general public only knows basically

that images were exchanged that you've seen.  You've seen

the grotesque nature of the defendant's sexual appetite for

children.  He clearly has a deviant mind as made clear in

all of the evidence presented to the Court.

I respectfully implore you to protect other

children.  He has requested leniency in his sentence.  I

firmly believe he is a deceiver by nature and should not be

trusted.  He obviously deceived the many character witnesses

that wrote glowing letters about him.

1          Anyone who-- Sorry.  Anyone who fantasizes about

2    raping children and ending their lives doesn't deserve to

3    walk another day in freedom.  I'm asking you to please give

4    my daughter the piece of mind she so greatly desires by

10:54:47  5    giving him a fair sentence.  Please don't give him the

6    opportunity to damage another innocent child.

7          Thank you.

8          THE COURT:  Thank you, ma'am.

9          VICTIM G.L.:  I met the defendant when I was 15

10:55:19 10    years old, in September of 2017.  We first made contact on

11    social media platform for users 13 years and up.  My age was

12    made very clear in the first message and he knew very well

13    how old I was, in fact, he said he wished I was younger.

14    I'm now 17 years old.

10:55:39 15          The last time I was in contact with the defendant

16    was January of this year.  I should be doing things like

17    planning for prom, applying to colleges, normal things most

18    people my age get to experience.  I missed over three months

19    of my junior year of high school during this period which

10:55:56 20    was not a priority anymore.  Instead my time has been spent

21    being questioned and interviewed by the FBI and with therapy

22    sessions as well as preparing to face my abuser in court.

23          For 465 days, a predator controlled every aspect of

24    my life.  I experienced discomfort, shame, and guilt every

10:56:16 25    day, and continue to struggle with it.  I will never get

1    that time back.

2         I'm a special needs student due to my emotional

3    disability, much less a student who he was trained to teach.

4    He knew this so much so that he asked for a copy of my IEP.

10:56:33  5    He knew I was on medication for my generalized anxiety

6    disorder and major depressive disorder.  Due to my suicidal

7    tendencies, he made me harm myself and show how I did it.

8    As result of my actions over the 15 months we were in

9    contact, I developed an eating disorder.  He made me

10:56:50 10    absolutely hate my body.

11        I was manipulated and exposed to things that have

12    scared me.  I was shown images and videos of children being

13    raped and abused, some included children under the age of

14    one.  He would tell me how badly he wished to molest a

10:57:16 15    child.  He'd tell me how badly he wished he could watch me

16    harm a child.  He would tell me how excited he was to

17    baby-sit his friend's toddler son because he finally had a

18    chance to fulfill his sexual fantasy of abusing a child.

19    Philip claimed it was okay because the toddler can't talk,

10:57:33 20    but I can.  Now, I want to be clear on what kind of man he

21    is, because if you knew, I guarantee you would no longer

22    trust him with your children.

23        He explained in great detail how badly he wanted to

24    rape his female special needs students, and proceeded to

10:57:52 25    send me videos of him masturbating on her desk.  He took

secret videos of young students in classrooms.  He sent me
videos of his father's dog doing sexual things to him to
sexually satisfy him.  His goal was to start a family and
teach the kids how to pleasure him and teach them it was all
right and what he desired was normal.  On multiple occasions
he explained his desire to purchase a child preferably
around the age of four, sexually actually abuse her, then
murder her, which he gave me graphic detail.  He made me
promise never to tell another sole his desire to abuse and
kill a child.

   I understand Paauwe served our country.  I also
understand that is something people are blaming his evil
desires on.  He enlisted at 18 years old and he told me how
he vividly remembered started having sexual thoughts of
young girls, 16 years old after.  In reference to the
character letters I find them laughable.  I no longer trust
anyone.  I constantly feel unsafe knowing he is still a free
man.

   I planned my own death more times than I can count.
The amount of guilt I felt was overbearing.  I dismissed
myself from those who love me dearly.  My relationship with
friends and family diminished greatly.

   You should be a source of safety for children,
someone they can trust and count on, but instead you use
your position for your own gratification.  You didn't want

1    to help anyone.  You wanted easy access to the most

2    vulnerable people.  You corrupted me and made me feel dirty.

3    But I'm here today knowing I am not the dirty one, you are.

4    I am now not controlled by you.  I can be free, but you

11:00:00  5    cannot.  You are now controlled.  You are no longer free.  I

6    get to move on from this and become the person I'm meant to

7    be.  You decided to throw away everything you worked for to

8    fulfill a sick fantasy you let consume you for years.  For a

9    while I felt bad for telling authorities all that I knew

11:00:25  10    about you, but I knew it was the right thing to do because,

11    your Honor, there is not a doubt in my mind he would act on

12    desires if he was given a chance.  Please do not allow him

13    another day.

14         Thank you.

11:00:37  15         THE COURT:  Thank you.

16         Mr. Mekaru, allocution on behalf of the government,

17    sir.

18         MR. MEKARU:  Your Honor, I've often thought of

19    sentencing as that time to take stock of an individual,

11:01:55  20    really look at the balance sheet of this individual; the

21    assets, their positive attributes, the liabilities, the

22    negative aspects of this individual, and ultimately using

23    that construct, to give us some guidance as to what is an

24    appropriate sentence.

11:02:17  25         I won't deny, and I think we even heard G.L.

acknowledge that there are attributes here of Mr. Paauwe
that are laudable.  He clearly has family who love him.  He
has demonstrated some ability to be a constructive member of
the community.  He served his country.

11:02:46   I would suggest to this Court, however, that many
of those positive attributes are things that the defendant
himself turned upside down.  His contributions to the
community, let's take a look at that.  His being a
productive member.  What vocation did he choose?  He chose
11:03:08   to teach, young children.  He chose jobs that gave him
access to young, vulnerable children, special education
children.  Kent Education Center at Oakley is a special
education school for emotionally impaired students, serves
students K through 8 who have significant emotional
11:03:41   impairments and persistent behavioral concerns.  This is
from their own website.  That is the job he chose.

Four different schools in the past five years.  A
child care worker.  Is it because he wanted to serve these
students or was it because he wanted access to those who
11:04:13   were vulnerable, not just perceived as being vulnerable, who
were, in fact, vulnerable.

Noted in the presentence report Paragraph 62.  He
video recorded a first or second grader who he saw putting
her hands down her pants.  He video recorded that.  I know
11:04:33   the child is doing something, but he was so enamored,

1    fascinated, that's what he wanted to record.  He is the one

2    who shares this fantasy to another child about wanting to

3    rape a student in his class, that same student who he

4    decides to masturbate on her desk.  In fact, apparently the

11:05:00  5    police found, and noted in Paragraph 31, that he had another

6    video of himself masturbating in the school parking lot.  So

7    was this really service or is this an opportunity.  He used

8    those skills he learned, those attributes, those

9    vulnerabilities of these special needs kids, and targeted

11:05:29  10    G.L.  Oh, he knew what buttons to push.  I'm stunned to hear

11    just now today that he asked for a report that I don't have

12    any idea what the report is, but apparently she clearly

13    knows what it is and who also knows, he does.  Apparently

14    this is a psychological report that educators are advised

11:05:50  15    of, used to help with the guidance and advancement of these

16    children.  Instead, apparently this was a mechanism for

17    abusing this poor girl.

18          You know, we talked about this pattern question.

19    Is he just an individual who somehow found himself

11:06:15  20    fascinated with one child?  Is G.L. the extent of what we

21    are talking about?  Is this pattern somehow overstating

22    really what is the risk here of this individual?  Well, I

23    don't like to be reminded by the fact the defendant came to

24    the attention of law enforcement not because G.L. had gone

11:06:36  25    to authorities, but because law enforcement had engaged in

1    an undercover operation where they had thrown out a comment

2    about what is taboo, and he leapt to, oh, having sex with a

3    dog, what is wrong with that?  Adults should to be able to

4    do that.  He then leapt to, oh, I see you are a single

5    mother with a 13 year old.  Boy, I can't help but stop

6    fantasizing about that.  He tried to manipulate G.L. into

7    assaulting her own family member, her own young sister.

8            Pattern is many times, under 4B1.5, and that

9    chapter is about prospectively looking at what sort of risk

10   a person may pose to the community.  It's a proxy, if you

11   will, to look forward, all right, what sort of history here

12   can inform us about their future risk.  You want some

13   insight into future risk?  Look at his chats.  Paragraph 71,

14   excruciating detail about how he wants to rape kids.  Not

15   only does he think about the prospect of raping them and the

16   consequences of doing that, to hide what he has done, slit

17   her throat, stab her to death.  That's an indication of

18   future danger.  That's an indication of future risk.

19           I am always feeling a level of gratitude, if not

20   indebtedness, to those who raise their hand and serve our

21   country.  It is undoubtedly one of the most important things

22   you can do in service of your country, your nation, and your

23   fellow citizens.  And I struggled with, you know, what sort

24   of indication that is for us in this case.  And I saw an

25   interesting quote that I thought was really pretty telling

11:06:54

11:07:30

11:08:06

11:08:46

11:09:18

11:09:52

11:10:15

11:10:51

in the context of this case.  His uncle, I think, shared this.  "In the chaos of battle character matters."  That's unquestionably true.  I have another quote for you.  "Character is what you are in the dark."  John Wooden, the famous basketball coach from UCLA is quoted for having a slight variance on that, "Character is what you do when people aren't watching."  And he had a similar comment to the difference between reputation and character.  "Reputation is what people think you are, what you show to people.  Character is what you truly are.  And what are you truly is what you are in those darkest moments."  Want to peer into the darkness that is the defendant's character, look at his chats.  It is awful.  It is depraved.  Look what he did to G.L.  It is devastating, manipulation of a 15-year-old child.

11:11:23

11:11:43

          Now, it's easy, I think, to consider this conduct as an isolated incident for those who look at someone from the outside.  Think of it has a mistake.  He made a mistake, made a bad decision.  I don't know what drove him to commit these crimes in some of the letters we have from the family members.  I don't doubt that.  I don't doubt that they feel like that.  The person they know is separate and completely distinct from the individual who is uttering and fantasizing these vile thoughts.

          But this isn't just a mistake.  This isn't a single

1    decision.  This is a course of conduct.  This is something

2    that spanned, what did I hear 465 days for this one child,

3    in addition to the chats that we have with the undercover,

4    and the shared insight where the defendant told G.L.

11:12:19  5    apparently he's been having these fantasies since he was 16,

6    before he served.  The quote from the presentence report,

7    Paragraph 71, where he says to her, "You promised to protect

8    my identity forever and ever.  To never show a sole that I

9    get hard and love watching children in pain and being

11:12:44  10   raped."  Never show a soul.  That's what he wants to keep

11   hidden.  And that's what he generally succeeded in keeping

12   hidden.

13        So all right.  What do we--  What else do we look

14   for in terms of future risk of recidivism.  How about

11:13:09  15   insight.  How about some understanding.  Well, we go to the

16   paragraph, it's Paragraph 80, where he was asked questions

17   about acceptance.  Why did you commit the offense?  His

18   response, "I'm not sure.  I know I should have walked away

19   and not engaged in sexual conversation on line, but I

11:13:36  20   didn't.  For a reason I chose to continue talking to her."

21   I see very little insight in that comment.  Somehow this is

22   her fault.  I should have walked away.  Yes, that's true.

23   But it sounds like it's somehow a poor decision.  No, this

24   is what he wanted.  This is an expression of who he is, what

11:14:09  25   he wants, and of his expression of his character.

1    Your Honor, it is incumbent upon us in evaluating

2    an appropriate sentence to consider those factors under

3    3553.  And I'm sure you will hear from the defense

4    attributes on the positive side where under 3553 he should

11:14:36    5    get some consideration.  But in evaluating those factors, I

6    would suggest to this Court there are considerations here of

7    protecting the community that weigh heavily in this

8    decision.  This is an individual who chose to be a teacher

9    to get access to vulnerable kids, and when he found one who

11:15:05   10    was receptive, he went all in.

11    She talked about her fear that he knew where she

12    lived.  Oh, yeah.  They found a Google map that he took a

13    picture of showing what path he would take from Michigan,

14    the highways passing through states, all the way to her

11:15:33   15    home.  This is a real danger.  This is an individual who we

16    have to evaluate what sort of risk does he pose.

17    The guidelines you have before you are 30 years to

18    life.  You know, it's not uncommon for us in evaluating an

19    appropriate sentence to take into consideration somebody has

11:16:03   20    pled guilty.  Myself think many times a sentence at the low

21    end of the range for somebody who has pled guilty is not

22    uncommon, many times representative of that acceptance and

23    the associated benefit, if you will, for acknowledging what

24    you've done and resolving the matter.  Your Honor, I do have

11:16:32   25    to wonder though, the defendant is 33 years old.  He is a

young man.  And that comes with both sadness for really

unrealized future as well as a fear of the danger that he

continues to pose.  Just pick a number, 10 years, 20 years.

Twenty years.  How old is he going to be in 20?

11:17:07  Fifty-three, younger than me.  Does he think he might pose a

risk to kids?  I do.  Thirty?  How about 30 years?  He will

be 63.  At 63, do we see defendants before you who have

committed exploitation offenses at age 63?  Yes, without

question.

11:17:39          I find myself asking this Court for a sentence that

is extraordinary, but I do ask this Court to consider a

sentence that would ensure the protection of the community

and ultimately, your Honor, that requires the defendant's

spending the rest of his life in prison.  It's a sad thing

11:18:01  to say, hard thing to observe, but I think it is ultimately

true in this case.

         Thank you.

         THE COURT:  Mr. Mekaru, did you want to address

restitution, sir?

11:18:14          MR. MEKARU:  Sorry, your Honor, I--

         THE COURT:  That's all right.

         If I understand, the request is for $34,000?

         MR. MEKARU:  Yes, your Honor.

         THE COURT:  And that's based on the breakdown that

11:18:30  you gave me?

1          MR. MEKARU:  Yes, your Honor.

2          Your Honor, we have in past cases with you

3    presiding, had similar situations where individuals who are

4    going to need future counseling.  I don't think there is any

11:18:50  5    question that a restitution order for future counseling

6    expenses is authorized by law and is appropriate.  I think

7    really where we are at at this point is perhaps more of a

8    question, in speaking with Mr. Borgula, is a question of

9    what sort of term ultimately is appropriate for calculating

11:19:18 10    an amount of restitution.

11          Your Honor, I'm not a counselor.  I'm not trained

12    in that area, but we do have a statement from a counselor

13    who is, in fact, seeing the victim in this case, who has

14    seen the impact of the defendant's conduct.  Actually they

11:19:47 15    are seeing her not for just an hour a week, but for 90

16    minutes a week.  This is an individual who was already

17    vulnerable and has clearly shared, I think, a lot of her

18    challenges with this Court.  It is completely understandable

19    where she would continue to need counseling services

11:20:07 20    indefinitely for the rest of her life.  This amount of a

21    hundred dollars a session is asking for ultimately I think

22    it's a pittance in reality.  Maybe that is the right amount

23    for today.  It may be the right amount for two years from

24    now.  I don't see that as being a realistic come ten years

11:20:36 25    from now.  It's probably going to be more.  The victim is

going to have to pay more than just that.  What she's asking

for at this instance, for quarterly sessions at a hundred

dollars a session, I think is more than reasonable.

Thank you.

THE COURT:  Mr. Borgula.

MR. BORGULA:  Thank you, your Honor.

Your Honor, Mr. Paauwe has never suggested that he

made a mistake here, and he is going to address the Court

after I do, but not once has he said as Mr. Mekaru has

suggested, that somehow he has just had a mistake in

judgment.  I mean he has no criminal record obviously, and

that shows that he hasn't committed any crimes and been

convicted.  But here, from the moment that law enforcement

became involved, he has never said oh, I just made a

mistake.  That is not true.  In fact, it's just at opposite.

He immediately said, I have a problem.  And that-- and he

was disgusted with his own behavior.

If you look at the presentence report, here's an

individual that made an immediate confession.  He was

approached by law enforcement and he did not quibble over

what happened.  He gave them his phone.  He gave them the

pass code.  He didn't have counsel.  He agreed to come back,

and he went to the FBI's office in Grand Rapids, and he met

with the FBI agents.  And again, he let them know, answered

all of their questions without counsel.  He was, of course,

1   charged, and first in the state, and then by the federal

2   government.  He appeared before Judge Carmody.  He appeared

3   before Judge Kent at the time of the plea.  He has had no

4   incidents on bond as both those courts placed him on bond.

11:22:38   5   His reaction after the charge was he sought counseling.  Not

6   once, I can confide with the Court, not once has he

7   suggested to me that he fight in any way his conduct or try

8   to find exoneration through a trial.  He pled to the most

9   serious charge.  And I can tell you without question of all

11:23:04   10  the clients I've had and all the people that I've been on

11  the other side as the government attorney, he is completely

12  disgusted by his behavior.  There is no question that this

13  is abhorrent.  No one can read the presentence report and

14  think well, this is-- there is some gray area here.  Of

11:23:23   15  course not.  And he is not saying that.  Nor has he

16  throughout this whole process.  He has not made excuses.  He

17  did not even wish for me to find an explanation.  I know I

18  did an attach some materials to the presentence report or to

19  my memorandum, but that's from counsel.  This man has

11:23:48   20  acknowledged to his counsel, to the government, and to the

21  Court that this is completely wrong.  And you are not going

22  to hear one word of excuse for his behavior.  But I believe

23  it is my job as his counsel, to find some explanation,

24  because this is not normal behavior.  No one acts this way.

11:24:10   25  No one does these things.  There has to be some explanation.

1    People aren't born this way.  He is not pure evil from the

2    womb.  And so what I look to is what I've noticed as a

3    defense attorney, especially in the past five years, an

4    alarming number of people that have seen active combat, have

11:24:34  5    seen people die, come back and have acted irrationally,

6    compulsively, and done horrible things.  And I think that if

7    you ask agents that are in this type of work, that do sting

8    operations, that you'll see an alarming rate of people that

9    see active combat do things that are not socially

11:24:58  10   acceptable.  And that's not an excuse.  It does not explain,

11   doesn't make someone a pedophile, that is not what we are

12   saying.

13        We are just asking the Court to consider that not

14   only his service, I mean it obviously is honorable that

11:25:16  15   someone served their country and spent time in the Middle

16   east fighting for their country, but also the effect that

17   that may have had.  And again, he is a marine.  He does not

18   want me to make an excuse that somehow this turned him into

19   a monster.  He believes his conduct is horrible, without

11:25:33  20   question.  But I do think that we are going to see over the

21   course of the next decade more and more studies like the one

22   I attached to my memorandum, where military veterans are

23   coming back, especially from active combat, and they are

24   acting compulsively.  And in the study I attached, the Kraus

11:25:54  25   study, that relates to sexual behavior, compulsive sexual

1       behavior.  It's not diagnosable, but I anticipate at some of

2       point you are going to see that it will be.  Psychologists

3       are still working on that.  I'm not a psychologist.  As the

4       government pointed out, they are not either.  We are just

11:26:10   5       asking for consideration that again, not only the fact that

6       he served, and served honorably, that perhaps it had some

7       effect on his behavior.

8               He fully expects to be punished, and punished

9       severely.  However, we ask that the Court consider whether

11:26:26   10      that's a mitigating factor.

11              Your Honor, we did attach a significant number of

12      letters.  I always ask the defendant if anybody supports him

13      can provide a letter to the Court.  Someone that knows him

14      well and has something to say that the Court might want to

11:26:47   15      consider.  Because the presentence report does obviously a

16      great job of laying out the crime, which is horrendous, and

17      lays out his general background, but you don't get a sense

18      of, as Mr. Mekaru has pointed out, his character.  And I

19      respectfully disagree with the government attorney on this,

11:27:02   20      that this man is not defined by these actions.  I don't

21      think that's his true character, and that's reflected in the

22      letters, and by the fact that there are many people behind

23      me today who still support him knowing very well what he had

24      done.  Because whether it be light or dark, he spent a lot

11:27:22   25      of time with these people and his character was reflected in

his dealings with them.  The most common theme is I can't

believe that this is Philip Paauwe, I just can't believe it.

Of course, I mean he is ashamed of his behavior.  He is

mortified by the fact he is going to stand here today and be

11:27:44  sentenced for a horrible crime.  But his reaction to when

law enforcement got involved was immediate confession and

plea to the most serious crime, and continue counseling.

He has tried in the past, even before he was

caught, to get into counseling.  He suffers always suffered

11:28:06  from severe depression and anxiety.  He hasn't had much

success with counseling.  I have a feeling he wasn't going

to the right counselors.  I think there is a possibility he

can be rehabilitated.  I think with proper counseling,

hopefully he can get some in the Bureau of Prisons system,

11:28:25  he can turn this around and show the world that he, in fact,

is the person that these people behind me believe him to be

and not the horrible monster that is depicted in the

presentence report.

You know, I've always thought sentencing is the

11:28:49  hardest thing a judge has to do, and it really falls on this

Court's hands.  And this is a tough case.  I have no excuse

for what he did.  I have tried to explain the best I can who

Mr. Paauwe is, but at the end of the day, the Court is faced

with a very tough position of having to provide sufficient

11:29:11  protection to the public, while at the same time recognizing

1      that each defendant is different and that the Court should

2      punish sufficiently, but not greater than is necessary to do

3      so.  And we ask and defer to the Court's discretion on what

4      a sentence should be.

11:29:32   5           Your Honor, he does ask that he be placed close to

6      home, if you can make that recommendation to the Bureau of

7      Prisons.

8           With regard to restitution, he don't dispute that

9      restitution is appropriate in this case.  I did question the

11:29:48  10   methodology.  I had never seen the manner in which it was

11     done, but based on the psychologist's recommendation, I

12     don't have a psychologist that can say otherwise, we defer

13     to the Court on what the appropriate amount of restitution

14     should be.

11:30:04  15           THE COURT:  Thank you, sir.

16          MR. BORGULA:  Would you like Mr. Paauwe to address

17     from the podium?

18          THE COURT:  He can either remain seated at counsel

19     table or stand at the podium, whatever he prefers.

11:30:14  20           Mr. Paauwe, you may proceed as you wish.

21          THE DEFENDANT:  Thank you, your Honor.

22          Your Honor, I have accepted responsibility for my

23     actions, and I know that what I have done is something that

24     no person should have ever done.  Therefore, I would like to

11:30:33  25   take this time to apologize to those I've hurt.  First, I

need to apologize to my wife, Tracy, who has stood by my

side through the past decade as my best friend and greatest

support.  She has been patient, and has always been there

for me.  And I am beyond sorry that I have let her down,

betrayed her trust, and hurt her so badly.  The pain I have

caused is something I never wanted to do.  And she does not

deserve the fact that I have stolen our future from her.

Throughout this process she has stayed in my life helping me

become a better person, so I say thank you for that.  I have

no words to describe how sorry I am for what I've done.

Though our marriage is over, please know that I will find a

way in the future to make this up to you by constantly

striving to be better.

        To G.L., I am immensely sorry for my actions

towards you and the problems I have caused you, and for not

being the mature adult and stepping away and being a better

man.  I am sorry that because of my actions I have caused

you long lasting pain and a loss of trust in people.  I know

the emotional toll I have taken is something that you should

never have had to deal with, not only to you, but also your

family who has been affected by my actions.  For everything,

I am truly sorry.

        To my family and friends, people that I couldn't

imagine standing or still being in my life, I am sorry for

doubting your love and support, but mostly I am sorry for my

actions and not thinking about how much this would affect

you.  This is not who I am.  And this is not who I will ever

be again.  Thank you to those who have seen me through my

mistakes-- or seen through my mistakes to the person you

know me to be.

And I feel it is important for me to talk for a

moment to say I am sorry to my students and their families.

Never should they have to fear about your students' safety,

and no student should be fearful of any adult in their

school.  No student under my care was ever in jeopardy of

being hurt, but I still feel awful for placing those doubts

in people's minds through things that I said.  And I

apologize for any and all issues that this has caused them.

Your Honor, this is not who I ever wanted to be and

this is not who I will ever be again.  Not with blind

determination will I continue forward into life striving to

be a better man, but with my support system and the

community you see behind me, with therapy and maintaining my

medication to remain mentally stable and stave off the

depression that tries to take over.  I will use all of the

tools available to me and the people who are still willing

to be in my life, to be the best person I can be.

I will use my time in prison to continue on the

path of rebuilding my life with focus, clear goals, and

determination.  Already in the past nine months I have made

1   drastic changes to my life and thought processes, to be a

2   healthier and better person.  This will continue so that

3   once again I may become a better, a productive, and law

4   abiding citizen.  All I can ask of the Court is to give me

11:34:21   5   the chance of a normal life again after I've served my time

6   and paid my debt to society.

7            Thank you, your Honor.

8            THE COURT:  Thank you, sir.

9            It is the Court's duty to impose a sentence

11:34:34   10   sufficient but not greater than necessary comply with the

11   purposes of sentencing set forth in 18 U.S. Code 3553(a).

12            The Court recognizes the guidelines are advisory to

13   the Court, but I have a taken the guidelines into account as

14   an initial benchmark or starting point when sentencing in

11:34:50   15   this case.

16            I recognize I must make an individualized

17   assessment based on the facts presented.  The guideline

18   range is one of the array of factors warranting

19   consideration.

11:35:01   20            I also fully recognize my discretion in determining

21   an appropriate sentence as recognized by the United States

22   Supreme Court in its decisions in Booker, Kimbrough, Rita,

23   Gall, Spears, and the Sixth Circuit case of Herrera-Zuniga.

24            Pursuant to Tapia vs. The United States, at 131

11:35:18   25   Supreme Court 2382, the Court recognizes that imprisonment

is not suitable for the purpose of promoting correction and

rehabilitation.

I have considered all of the defendant's arguments

in support of his request for a lower sentence.

The 3553 factors are the nature and circumstances

of the offense and the history and characteristics of the

defendant.  The sentence must reflect the seriousness of the

offense; promote respect for law; provide just punishment

for the offense; afford adequate deterrence to criminal

conduct; protect the public from further crimes of the

defendant; provide the defendant with needed medical,

educational, and/or correctional treatment; the need to

avoid unwarranted sentencing disparity among similarly

situated defendants; any guideline policy statements that

pertain and the kinds of sentences available to the Court.

First, as far as recommendations to the Bureau of

Prisons is concerned, the Court recommends the defendant

receive mental health treatment and counseling while he is

incarcerated.  I also recommend that he receive sex offender

treatment and counseling while he is in the institution.

It's my earnest hope that the defendant cooperates with his

counselors and assists the mental health professionals in

understanding what his motivations here were as far as the

mental health side of this particular case as asserted by

the defendant.

1    I've had the benefit of the study that Mr. Borgula

2    referenced during the course of his allocution, it seems to

3    me that perhaps the Veterans Administration is in the

4    infancy of trying to determine whether there is a tie

11:37:01   5    between military service and the sorts of grotesque behavior

6    which are attendant to this case.  I must say that it's

7    early in the evaluation of these sorts of factors, but

8    obviously to the extent that the defendant can assist the

9    mental health treaters within the Bureau of Prisons, that

11:37:25  10    would be helpful moving forward.

11    There is no doubt that the defendant has no prior

12    criminal history, that's why we have Criminal History

13    Category I, otherwise perhaps he would be in a different

14    situation as far as the advisory guideline is concerned.

11:37:46  15    However, he clearly is in Criminal History Category I, and

16    that's designed to set an advisory guideline range for an

17    individual who has no criminal history.  It's also true that

18    the defendant sought counseling after being apprehended by

19    federal authorities, and of course, that's a positive step

11:38:10  20    moving forward.

21    The Court also notes his service in the military.

22    As Mr. Mekaru indicated, service to country is extremely

23    important, and to that extent, the defendant is to be

24    congratulated in that regard.  And it's also very clear from

11:38:33  25    the number of letters that the Court received that he has

1    very significant support from family and members of the

2    community who know him best.

3         Having assessed those factors, the Court turns to

4    the nature and circumstances of this offense.  The Court's

11:38:56    5    been a judge now for almost a quarter century.  I must say

6    that the degree of depravity and the grotesque nature of

7    this offense is one which the Court has not seen often and

8    indeed I'm not sure I've ever seen a course of conduct

9    involved here attendant to this particular case.

11:39:25   10         Mr. Mekaru makes a very good point in that, yes,

11    indeed the defendant was a teacher.  He was a teacher of

12    children who had emotional difficulties.  He attaches

13    himself via internet to the victim in this case, and the

14    degree of manipulation and the grotesque nature of the

11:39:53   15    communications between the defendant and the victim in this

16    case is just unbelievable.  As experienced as I am, I have

17    never read this before.  The seriousness of the offense and

18    the victimization here is obvious.  Not the least of which

19    is the eloquent victim impact statements that the Court

11:40:21   20    heard today, as well as the victim impact statements that

21    were submitted in writing.

22         The Court must be mindful of general deterrence of

23    others who might contemplate similar criminal activity.

24    That is a very significant factor in the Court's judgment

11:40:41   25    for the Court to consider.  This defendant needs to be

specifically deterred.  I recognize that he has been seeking

counseling, and I recognize that at least one mental health

professional believes there is a tie to his military

service.  But at this point in time, the Court views this

11:41:01  defendant to be a very dangerous individual.  Perhaps with

counseling moving forward, he can change that.  I hope

that's true.  I hope that the mental health professionals in

the Bureau of Prisons can help him.  But at this point in

time, on September 12th, 2019, I view this defendant as a

11:41:26  significant threat to the public.

       The defendant has requested that I grant him a

variance from the advisory guideline range for the reasons

that are stated in Mr. Borgula's presentation, not the least

of which is his community support, his family support, as

11:41:50  well as his military service to the United States, which

I've already indicated he should be congratulated for.  But

in this case, given the consideration of all of the 3553

factors, I don't believe a variance downward is appropriate,

and in the Court's judgment this is not a case which should

11:42:14  be dealt with at the low end of the advisory guideline

range.

       I can't under-- I can't emphasize enough the

grotesque behavior here, the seriousness of the offense, the

impact on the minor who was the victim in this case, the use

11:42:35  of his teaching position in perpetrating this monstrosity.

1       In the Court's judgment, a sentence at the low end of the

2       guidelines is not appropriate, and the Court intends to

3       impose a sentence in this particular case which is above the

4       advisory guideline minimum.

11:43:00  5       I fully recognize my discretion in determining an

6       appropriate sentence, but the Court believes that a sentence

7       above the minimum of the advisory guidelines is the

8       appropriate sentence in this case.  It would provide just

9       punishment and promote respect for law.

11:43:20  10      Accordingly, it's the judgment of the Court the

11      defendant is committed to the custody of the Bureau of

12      Prisons for a term of 420 months.

13      Upon release from imprisonment, the defendant shall

14      be placed on supervised release for a term of ten years.

11:43:35  15      Within 72 hours of release from custody of the

16      Bureau of Prisons, the defendant shall report in person to

17      the probation office in the district to which he is

18      released.

19      While on supervised release, the defendant shall

11:43:46  20      comply with the mandatory conditions of supervision,

21      including sex offender registration and DNA collection.

22      Drug testing is suspended.

23      Additionally, the defendant shall comply with the

24      following special conditions of supervision:

11:44:00  25      Participate in a sex offender assessment and/or

11:44:16

treatment as approved by his probation officer, which may include physiological testing such a polygraph and/or ABEL assessment.  He will contribute to the cost of the treatment in an amount approved in advance by his probation officer and waive confidentiality concerning the treatment.

He must participate in a program of mental health treatment as directed, follow the rules and regulations of the program until he is released by his probation officer, and pay at least a portion of the cost according to his ability to pay.

11:44:31

He must provide his probation officer with access to any requested financial information, authorize the release of any financial information.  The probation office will share financial information with the United States Attorney's Office.

11:44:45

His residence and employment must be preapproved by probation.

He must not associate or have any contact with convicted sex offenders unless in a therapeutic setting with the prior permission of his probation officer.

11:44:57

He must not be employed in any position or participate as a volunteer in any activity that involves contact with children under the age of 18, except as approved by his probation officer.

11:45:11

He must not have any contact with minors under the

age of 18 without written approval of his probation officer,

and shall refrain from entering into any area where children

frequently congregate, including but not limited to, parks

schools, daycare centers, theme parks, theaters, and

playgrounds.

He must not possess any materials depicting

sexually explicit conduct as defined by statute, including

visual, auditory, telephonic, or electronic media, and/or

computer programs or services.  He must not patronize

anyplace whose primary purpose is to promote such materials

or entertainment.

He must not access or possess any computer or

computer-related devices without approval of his probation

officer.  He must not have another individual access the

internet on his behalf to obtain files or information which

he is restricted from accessing himself or accepting files

or information from another purpose-- I'm sorry, from

another person.

He must not possess or be the primary user of any

cellular telephone or other electronic device without the

prior permission of his probation officer.  If he is given

permission to use or possess a cell phone, he must provide

the number to his probation officer, and the telephone must

be maintained in his name or a name approved in advance by

his probation officer.  He shall submit monthly bills of any

1   device for which he has permission to use.

2          He must submit his person, property, house,

3   residence, vehicle, papers, electronic devices to a search

4   conducted by the United States probation office.  Failure to

11:46:51   5   submit to a search may be grounds for revocation of release.

6          He must warn any other occupants of the premises in

7   which he works or lives that it's subject to search pursuant

8   to this condition.  The probation officer may conduct a

9   search under this condition only when reasonable suspicion

11:47:07   10   exits that he has violated a condition of supervision, and

11   that the areas to be searched contain evidence of a

12   violation.  Any search must be conducted at a reasonable

13   time and in a reasonable manner.

14          The special assessments of $100 is ordered due and

11:47:24   15   payable immediately.

16          In addition, the Court assesses the special

17   assessment of $5,000 pursuant to the Justice For Victims of

18   Trafficking Act of 2015.

19          Restitution is ordered in a total amount of

11:47:39   20   $34,000.  Having assessed the defendant's ability to pay,

21   payment of the total monetary penalties shall be due as

22   follows:

23          Minimum quarterly installments of $25 based on IFRP

24   participation or minimum monthly installments of $20 based

11:47:55   25   on UNICOR earnings during the period of incarceration to

commence 60 days after the date of the judgment.  Any

balance due upon commencement of supervision shall be paid

during the term of supervision in minimum monthly

installments of $100 to commence 60 days after release.

11:48:12    Additionally, the defendant shall apply lottery

winnings, judgments, or other anticipated or unexpected

financial gains to any outstanding court ordered financial

obligation.

In light of the other obligations, the defendant

11:48:25  has on a financial side, the Court will not impose a fine

and waives interest on the restitution.

Mr. Mekaru, there was a forfeiture allegation, sir,

do you wish me to enter a judgment in that regard?

MR. MEKARU:  I do, your Honor.  I don't know the

11:48:46  status of the restitution.  It is, as I understand it, but

we would ask it be included.

THE COURT:  The Court will include the forfeiture

request of the government.

Mr. Borgula, any other recommendations to the

11:49:02  Bureau of Prisons that you would like?

MR. BORGULA:  I can't recall if you addressed

placement near home.

THE COURT:  If I didn't, I intended to.

Close to home as possible.  However, the Court's

11:49:15  recommendations involving mental health and sex offender

1    treatment ought to take precedence in the Court's judgment.

2            MR. BORGULA:  And I think we agree with that, your

3    Honor.  And Thank you.

4            THE COURT:  All right.  Thank you.

11:49:25  5            Mr. Borgula, other than the objections already on

6    the record, any legal objection to the sentence imposed?

7            MR. BORGULA:  No, your Honor.

8            THE COURT:  Are you satisfied I've addressed all of

9    your arguments on the record?

11:49:33  10            MR. BORGULA:  Yes, your Honor.

11            THE COURT:  Thank you.

12            Mr. Mekaru, any legal objection to the sentence

13    imposed?

14            MR. MEKARU:  Your Honor, I gather with respect to

11:49:41  15    the special terms of supervised release that you've adopted

16    the grounds and reasoning based on the presentence report

17    recommendations?

18            THE COURT:  That's true.

19            MR. MEKARU:  Thank you.

11:49:51  20            THE COURT:  And I think it's those are totally

21    supported by the record.

22            MR. MEKARU:  Yes, sir.  No objection.

23            THE COURT:  Counts to be dismissed?

24            MR. MEKARU:  Yes, your Honor, Counts Two through

11:49:59  25    Five of the Indictment.

```
 1              THE COURT:  Those counts are dismissed pursuant to

 2      the plea agreement.

 3              I advise you, sir, you can appeal your conviction

 4      if you believe that your guilty plea was somehow unlawful or

 5      involuntary or if there is some other fundamental defect in

 6      the proceeding not waived by your guilty plea.

 7              You also have a statutory right to appeal your

 8      sentence under certain circumstances, particularly if you

 9      think the sentence is contrary to law.  However, a defendant

10      may waive those rights as part of a plea agreement, and you

11      have entered into a plea agreement which waives some or all

12      of your rights to appeal the sentence itself.  Such waivers

13      are generally enforceable, but if you believe the waiver is

14      unenforceable, you can present that argument to the

15      appellate court.

16              You have the right to apply for leave to appeal in

17      forma pauperis if you are poor.  If you wish to do so, with

18      a few exceptions, you need to file the appropriate documents

19      within 14 days of the entry of the judgment in this case.

20      Your attorney will prepare and file a notice of appeal upon

21      your request.

22              Counsel is advised of his obligation it advise his

23      client of his appellate rights.  Should your client wish to

24      pursue an appeal, the forms for filing an appeal can be

25      found on this Court's website or the Court of Appeals'
```

11:50:11 (line 5)
11:50:24 (line 10)
11:50:38 (line 15)
11:50:52 (line 20)
11:51:04 (line 25)

1    website.  Should your client choose to appeal, you are

2    obligated to continue representation of him until such time

3    as you are specifically relieved by the Court of Appeals.

4            The Court views this case as a mandatory remand

11:51:20  5    case.  Do you concur, Mr. Mekaru?

6            MR. MEKARU:  I do, your Honor.

7            THE COURT:  Mr. Borgula?

8            MR. BORGULA:  He is prepared to go in, your Honor.

9            THE COURT:  All right.  Defendant is remanded to

11:51:31  10   the custody of the marshal for execution of sentence.

11           That's all.  Thank you.

12           COURT CLERK:  All rise, please.

13           Court is adjourned.

14       (At 11:51 a.m., proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3                                   C E R T I F I C A T E

4

5          I, Kathleen S. Thomas, Official Court Reporter for the

6    United States District Court for the Western District of

7    Michigan, appointed pursuant to the provisions of Title 28,

8    United States Code, Section 753, do hereby certify that the

9    foregoing is a true and correct transcript of proceedings

10   had in the within-entitled and numbered cause on the date

11   hereinbefore set forth; and I do further certify that the

12   foregoing transcript has been prepared by me or under my

13   direction.

14

15

16                       /s/

17                       _____

18                       Kathleen S. Thomas, CSR-1300, RPR
                         U.S. District Court Reporter
                         410 West Michigan
19                       Kalamazoo, Michigan   49007

20

21

22

23

24

25